**JENSEN et v REPUBLIC STEEL CORP., et**

Common Pleas Court, Cuyahoga Co.

No. 426,867

## OPINION

By LAUSCHE, J.

This action was brought originally by the plaintiffs, Frances Wheal, Iva Jensen and Frances Falkenstein in behalf of themselves as stockholders and all other stockholders of The Republic Steel Corporation of New Jersey against the defendants, William G. Mather, Edward B. Greene, George F. Humphrey, Myron A. Wick, Philip Wick, Tom R. Girdler, Joseph O. Eaton, Henry A. Raymond and Frank H. Hobson, as directors of The Republic Iron & Steel Company and The Republic Steel Corporation of New Jersey, and L. Gordon Watson, as a

director and officer of The Republic Steel Corporation of Delaware, alleging that the defendants were negligent in the performance of their official duties as directors in:

1. A transaction wherein fifty thousand shares of Inland Steel stock were purchased by The Republic Iron & Steel Company, and,

2. A transaction wherein one million, five hundred thousand dollars was loaned to Industrial Shares, Inc.

In regard to the first claim the plaintiffs specifically asserted:

A. That the 50,000 shares of Inland stock were accumulated by the defendant directors in their private capacities, and that on January 15, 1930, when Inland stock on the exchange was selling for $74.00 a share, the directors caused The Republic Iron & Steel Company to buy said stock from themselves at an average price of $96.00 per share.

B. That in the event the proof fails to show that the said stock was purchased by the defendant directors as a group in their private capacity, they then acting in bad faith caused The Republic Iron & Steel Company to purchase said stock with the intention and knowledge of saving certain fellow directors from a loss of $1,000,000 reflected by the difference in value of Inland stock as purchased by said fellow directors prior to January 15, 1930.

C. That in the event the proof fails to establish either that the defendant directors purchased from themselves the fifty thousand shares of stock or in bad faith purchased the stock with a view of saving some of their fellow directors, that then the directors are liable because of their negligence in paying for said stock the sum of $4,808,515.54 when the aggregate value based upon the per share quotation on the exchange on January 15, 1930, was $3,700,000.00.

Respecting the first phase of the plaintiffs' claim it is asserted that four of the directors, to-wit, T. M. Girdler, J. O. Eaton, H. A. Raymond and E. H. Hobson, though they were not directors of Republic Iron & Steel Corporation when the stock was purchased, they are nevertheless liable because subsequently when they became directors of The Republic Steel Corporation of New Jersey they did on July 29th, 1930, ratify the purchase of said 50,000 shares of Inland by paying therefor the balance of the purchase price that was then due.

The second main phase of the plaintiffs' claim asserts that on April 4, 1930, the defendants, William G. Mather, E. B. Greene, George Humphrey, Myron Wick and Philip Wick negligently allowed a loan of $1,500,000 to be made by The Republic Steel Corporation of Delaware, an investment subsidiary of The Republic Steel Corporation of New Jersey to Industrial Shares, Inc. an insolvent corporation. It is claimed by the plaintiffs that as a result of the alleged plan The Republic Steel Corporation of New Jersey suffered a loss of approximately $1,000,000.

Pertaining to the loan of $1,500,000 the plaintiffs specifically claim:

1. That the defendants, William G. Mather, E. B. Greene, George Humphrey, Myron Wick and Philip Wick were negligent in delegating to other persons performance of their duties as directors and in failing to supervise the business transactions negotiated by the subsidiary investment company, The Republic Steel Corporation of Deleware.

2. That the five defendants just mentioned and the defendants T. M. Girdler, J. O. Eaton and F. H. Hobson were negligent in failing within a reasonable time to discover the loan and rescind the transaction and to sell the collateral posted as security for the payment of the loan.

3. That all of the defendants, excepting Watson, were negligent when they allowed The Republic Steel Corporation of Delaware to surrender to Continental Shares, Inc., 25,000 shares of Harbison and Walker's stock in exchange for 10,000 shares of Youngstown Sheet & Tube stock as security for the payment of the $1,500,000 loan.

To the petition of the plaintiffs the defendants have filed answers denying that they were in any manner negligent in the performance of their duties

as directors and further alleging as special defenses:

1. That the plaintiffs aforementioned were not stockholders of Republic Iron & Steel Company at the time the alleged causes of action arose and therefore have no right to maintain the suit.

2. That the action of the plaintiffs, being a stockholders derivative suit, was improperly brought because no proper legal demand was made by the plaintiffs upon the directors to bring the action.

3. That the action of the plaintiffs is brought in bad faith, and,

4. That the action of the plaintiffs was not brought within the time provided by the statute of limitations.

The petition was filed on May 10, 1935. All of the acts upon which the claims of the plaintiffs are based occurred before May 10th, 1931, except the exchange of the 25,000 shares of Harbison and Walker stock for 10,000 shares of Youngstown Sheet & Tube stock as security for the $1,500,000 loan which took place on May 11, 1931, and was ratified by the directors on May 12, 1931.

On May 4, 1938, Flora Haas and Wallace Keep of New York City and Leonard Blum of the City of Cleveland were given leave to become intervening petitioners and adopted as their complaint the allegations contained in the pleadings of the original plaintiffs.

Throughout this opinion the Court will refer to the Republic Iron & Steel Company as "Republic Iron;" to The Republic Steel Corporation of New Jersey as "Republic of New Jersey" and to The Republic Steel Corporation of Delaware as "Republic of Delaware."

Respecting the purchase of the 50,-000 shares of Inland Steel stock the testimony shows that sometime immediately prior to March, 1929, Elmer T. McCleary, now deceased, the then President of Republic Iron and Cyrus Eaton, not a defendant in this action, but a director of Republic Iron, had a meeting with the defendant, L. Gordon Watson, during which Mr. Watson was instructed to open an account with Otis

& Company for the purpose of purchasing Inland Shares; following that conference, Watson opened what was known as the H-10 account with Otis & Company and between March and November, 1929, in gradual day by day purchases, accumulated 50,000 shares of Inland stock at an average price of $94.00 per share. While these shares were being accumulated by Mr. Watson, monthly statements were sent to him showing the credits and charges on that account. Upon the receipt of these monthly statements he submitted them to Cyrus Eaton and E. T. McClearly for examination. The account was not listed in his name and he made no payments of any character whatsoever into the account. The testimony further establishes the fact that contemporaneously with the opening of the account there was deposited by Republic Iron the sum of $1,000,000 into an account bearing the symbolic identification of N.Y. 158. Excluding this $1,000,000 deposit no credits appear in the account in favor of the owner except the gradual increase in the number of Inland Shares as they were being purchased during the period beginning in March and practically ending sometime in November of 1930.

The testimony further establishes that on January 15, 1930, the defendants William G. Mather, E. B. Greene, George Humphrey, Myron Wick and Philip Wick, acting as executive officers of Republic Iron authorized the purchase of the 50,000 shares of Inland for a price of $4,808,515.54; that on the same date after the adoption of the resolution by the executive committee authorizing the purchase of these shares the subject was reported to the Board of Directors of Republic Iron. The minutes of the Board of Directors are silent on this subject while the minutes of the executive committee were not found in the minute books but after the death of E. T. McClearly were found in a desk in his company office at Youngstown, Ohio.

The five defendants just mentioned contend that the purchase on January 15, 1930, of the 50,000 shares of Inland

was the consummation of a decision made by the Board of Directors in a special meeting had on October 26, 1927. An examination of the minutes disclose that on October 26, 1927, a discussion was had at a meeting of the Board of Directors about the advisability of evolving a program of mergers which would minimize the competitive bidding and ruinous competition that was in progress in the steel industry. It was further pointed out that the hazardous condition which existed in the steel industry could only be eliminated by the merger of those steel companies where local conditions were favorable to consolidation. It was suggested at that meeting that as a first step in the direction of a merger that Republic Iron should proceed to acquire 40 to 50 thousand shares of common stock of Inland of Chicago, Illinois. It appears that after the financial condition of the Company was analyzed and discussed a motion was made and carried authorizing a committee, consisting of John A. Topping, H. W. Croft and Cyrus S. Eaton to purchase:

"A substantial number of shares of the common stock of the Inland Steel Company."

The minutes of that meeting also indicate that the shares so purchased were to be used in conjunction with associated interests which at that time represented that they already had approximately 200,000 shares of Inland under control. In pursuance to this authorization the aforementioned committee within one month purchased 3300 shares of said common stock at an average price of $51.00 a share or an aggregate cost of $168,644.60.

With the exception of the 3300 shares just mentioned and 18929 shares of Inland acquired through a merger of Trumbull Steel Company with Republic Iron in 1928, no other purchases were made of Inland until January 15, 1930.

The testimony further establishes that in March, 1927, a syndicate comprised of a large number of investors was formed for the purpose of buying Inland Steel stock. This syndicate, made up of about 60 participants, in the course of six months, purchased approximately 100,000 shares of Inland stock at an average per share cost of $62.00 and in November, 1928, sold those 100,000 shares of Continental Shares, Inc., at a price of $72 per share, netting to the members of the syndicate a profit of $1,000,000 or an average profit of $10 per share. These 100,000 shares acquired by the syndicate and sold by it to Continental Shares Inc. were, subsequent to November, 1929, sold to Cliffs Corporation, an enterprise in which Mather and Greene had substantial interests.

The testimony further establishes that in the period beginning in October, 1927, when the Board of Directors of Republic Iron decided to buy Inland stock with a view of future mergers, the subject of consolidation between steel companies was widely discussed and resulted in a number of mergers. The purpose of these mergers was to form combinations with companies that were able to complement each other in the diversity of products and to obtain advantages from the standpoint of the natural resources owned and to eliminate as much as possible the cost of transporting to the consuming public.

It is the contention of the defendants, William G. Mather, E. B. Greene, George Humphrey, Myron Wick and Philip Wick, that on January 15, 1930, when they as members of the executive committee purchased the 50,000 shares of Inland they did so in good faith in accordance to the policy expressed by the Board of Directors in October, 1927, and in the belief that it was absolutely essential that Republic Iron acquire a substantial interest in Inland to be used to facilitate a merger with Republic or to prevent the merger of Inland with other competing steel companies. The testimony establishes that in the latter part of December, 1929, Cyrus Eaton communicated to E. T. McCleary by letter that 50,000 shares of Inland had been acquired by Otis & Company at an average price of $94.00 per shares and that those shares were available to Republic Iron at cost price

plus carrying charges. No disclosure was made nor anything occurred which would inform the five members of the executive committee that these shares of stock were accumulated in the manner hereinbefore described.

The proof regarding the sales of Inland as already indicated shows that in 1927 the Inland Steel syndicate accumulated approximately 100,000 shares at an average per share cost of $62.00; that these 100,000 shares in November 1928, were sold to Continental Shares at $72 per share, the quoted market price; that the 50,000 shares of Inland, the subject of this controversy, were acquired in 1929 at an average cost of $94.00 per share. The testimony further establishes the fact that on August 26, 1929 Inland was selling on the stock exchange at $113.00 per share, the high price of that year and on October 14th began a gradual slide and by January 15, 1930, was quoted at $74.00 per share. Beginning on January 1, 1930, Inland began to rise gradually and on March 11, 1930, had reached the price of $98, the high price of that year.

The testimony further establishes that Inland Steel in 1929 on its common stock paid a dividend of $10.00 per share. During that period and prior thereto while the merger of steel companies was being widely discussed and consolidations consummated, Inland Steel was zealously and covetously looked upon by the leaders of the steel industry. The directors of The Republic Iron had studied the raw material properties of Inland Steel, its business management, its location, its profits, its balance sheets and its future outlook and they concluded that the merger with Inland was advisable, and if that could not be accomplished, that a sufficient interest in Inland should be acquired to negative the ability of other leading steel companies merging with Inland.

It is my finding of fact that from the testimony that has been offered that William G. Mather, E. B. Greene, George Humphrey, Myron Wick and Philip Wick made no secret profits out of the purchase of the 50,000 shares of Inland stock and that they had no per-

sonal interest of any character whatsoever in the sale of those shares to Republic Iron.

It is further my finding of fact that they did not act in "bad faith" or with the intention of saving any fellow directors who were speculating in Inland Steel from a loss produced by the stock market crash which came in the fall of 1929.

It is further my finding of fact that the members of the executive committee just hereinbefore mentioned, had no knowledge of the arrangements that E. T. McCleary and Cyrus Eaton made with reference to the purchase of the 50,000 shares of Inland Steel stock, nor did said members have knowledge that a million dollars of Republic Steel Corporation's money was deposited as collateral to secure the purchases made in the H-10 account.

Were or were not these particular defendants negligent in purchasing for Republic Iron these shares at the aggregate price of $4,808,515.54?

While it is obvious that the defendants in the purchase paid approximately $97 per share for the Inland while it was selling for $74 per share on the stock exchange, it does not **ipso facto** follow that the price paid was excessive.

The decisions in Ohio and elsewhere, as indicated by the discussion hereinafter made in connection with the exchange of Harbison and Walker stock, lay down the rule that the per share exchange quotation is not a fair criterion to judge the reasonable market value of a comparatively large block of shares. The disparity between the average price paid and the quoted exchange price must be taken into consideration with other testimony on the subject and thus the fair market value determined.

After a consideration and comparison of the testimony dealing with the sales and purchases of Inland, the general desirability of obtaining its stock, the excellence of its business, its strategic business location in relation to the raw materials and the consumers, and all other factors reflecting

upon the value of the stock, it appears to the court the preponderance of the proof lies with the plaintiffs in their claim that the price paid was excessive.

Though a director cannot be held liable for damages resulting from a mistake of judgment reached in the exercise of due care, the bona fides of the judgment is not a defense when it results from a negligent consideration of the problem.

While the Board of Directors of R. I. and S. did on October 26, 1927, indicate an intention to acquire Inland Steel, that purpose was not prosecuted to consummation but was allowed to remain in a dormant state.

The purchases, amounting to 3300 shares, that were made in pursuance to the resolution, were made in small daily blocks during the period of the one month following the adoption of the resolution. But thereafter no activity was exercised by the Board, although Inland was available in small blocks as shown by the acquisition of the 50,000 shares by McCleary and Eaton.

The evidence fails to disclose that anything occurred, except the offer of sale made by Cyrus Eaton, at any time after October 26, 1927, and before June 15, 1930, that would reanimate the slumber into which the proposal to purchase was permitted to lapse.

The sudden interest evidenced by the unusual purchase of the extraordinarily large block is conspicuous in this transaction.

While the plaintiffs have failed to establish fraud or the acquisition of secret profits, either actually, or indirectly by the avoidance of personal losses, they have established that the five defendant directors were negligent in the purchase of the Inland stock.

They listened to McCleary and Eaton and were induced to make the purchase. McCleary and Eaton were personally interested in the sale. The suddenness of the purchase, the price paid in the face of a falling market, the absence of a reason supporting the purchase of the large 50,000 block indicates that they did not exercise due care.

Are the directors, T. M. Girdler, J. O. Eaton, H. A. Raymond and F. H. Hobson liable for the purchase of 50,000 shares of Inland on the theory that they did on or about July 29, 1930, ratify the purchase of said shares by paying therefor the balance of the unpaid purchase price? These four defendants were not directors of Republic Iron but did become directors and officers of Republic of New Jersey after it was created by the merger of Republic Iron, Bourne-Fuller, Daniels Steel and Central Alloy.

The Republic of New Jersey, the product of the consolidation and merger of the four companies hereinbefore mentioned, had assets of approximately $325,000,000. It became necessary to co-ordinate the activities of these several companies and to intertwine the separate businesses, assets, accounts and personnel into a harmonious whole. It was a gigantic task and required unlimited time and attention.

When these four new directors took office the books of the new company showed an indebtedness to Otis & Company for the purchase of 50,000 shares of Inland. There was no cause for them to bore or ferret through the books. Nothing had occurred to warrant a scrutiny of the indebtedness that existed for the purchase price of Inland stock.

Moreover even if such an investigation had been made it would have been discovered that at one time between January 15, 1930 and July 29, 1930, the date on which the unpaid purchase price was delivered to Otis & Company, Inland had risen to $96.00 per share on the stock exchange.

Recognizing that it is the obligation of a director to act in good faith and with that degree of care which ordinarily prudent men exercise under similar circumstances in the prosecution of their own businesses and in like capacities while engaged by others, it

cannot be said that the defendants, T. M. Girdler, J. O. Eaton, H. A. Raymond and F. H. Hobson were negligent, because they, on July 29, 1930, caused the balance of the purchase price to be paid for the Inland stock.

While a director is required to be reasonably informed about the status of the financial accounts, the law does not require him to unreasonably search through the books with a view of finding whether some time in the past some previous director might have caused damage to the corporation through the negligent performance of his duties. As I have already indicated, the new corporation became a $325,-000,000 enterprise. It became the third largest iron and steel company in the United States. If I accept the view advocated by counsel for the plaintiffs in this action I would in practical effect declare that, regardless of the circumstances of the volume of work, a director newly elected must begin a search of the company's books to ascertain whether or not dereliction because of negligence had been committed by previous directors.

Moreover, no presumption of law exists that the directors of a corporation are possessed with a full knowledge of what its books and records and minutes contain.

**Goff v Emde, 32 Oh Ap 216, 167 N. E. 669 (1928); Mason v Moore, 73 Oh St 275, 76 N. E. 932 (1906); Briggs v Spaulding, 141 U. S. 132 (1891); Noll v Boyle, 140 Kan. 252, 36 P. (2) 220, (1934).**

The directors in the management of a corporation's affairs are required under the law to act as reasonably prudent persons. They are not the insurers of the correctness of all acts by them undertaken, and under their duties to reasonably supervise the corporate business they cannot be held liable for those losses that result in spite of the fact that they had acted reasonably, prudently and diligently in the fulfillment of their duties as directors.

With regard to the defendants, T. M. Girdler, J. O. Eaton, H. A. Raymond and F. H. Hobson the evidence not only fails to establish negligence on their part but it convincingly shows that they did all that could be expected of reasonable men in the management of the business of the company.

It is therefore my finding of fact that the plaintiffs have utterly failed to establish any negligence on the part of these four directors respecting the purchase of the 50,000 shares of Inland.

ARE ANY OF THE DIRECTORS LIABLE ON ACCOUNT OF THE $1,500,000 LOAN THAT WAS MADE BY REPUBLIC OF DELAWARE TO INDUSTRIAL SHARES, INC.?

In general the second complaint of the plaintiffs deals with the loan of $1,500,000 made by Republic Steel of Delaware to Industrial Shares, Inc. Republic of Delaware has thus far only incidentally been mentioned in the discussion of the question herein involved.

This corporation was created on March 7th, 1930, in pursuance to a plan originated in November, 1929. At that time it was decided to merge Bourne & Fuller, Republic Iron, Central Alloy and Donner Steel into the Republic Iron & Steel of New Jersey, and also to create a subsidiary investment company. In November, 1929, informal discussions of the formation of such a company were had, and on January 15, 1930, the Board of Directors of Republic Iron authorized Mr. McCleary to formulate and report back to the executive committee a plan for organizing such a subsidiary company.

Though the authorization of January 15, 1930, did not specifically empower Mr. McCleary to organize the subsidiary, under a mistaken interpretation of the order, he went forward with the necessary legal proceedings and a charter creating the Republic of Delaware was issued by the State of Delaware on March 7th, 1930.

The first meeting of the Republic of Delaware was held on March 13, 1930. The directors at that time were William P. Belden, E. T. McCleary, Roland J. Lehman, W. R. Burwell and Thomas F. Patton. At that meeting a resolution was adopted under which 1,000 shares of the common capital stock of Republic of Delaware were to be issued to Republic Iron in consideration of 10,000 shares of Gulf State Steel stock, 22,272 shares of the common capital stock of Inland and $400,000 in cash. This transaction between the Republic of Delaware and Republic Iron was consummated and the details carried out at the direction of Mr. McCleary and without the knowledge of the directors or the executive committee of Republic Iron.

Nothing appears in the minutes of Republic Iron about this transaction until July 29, 1930, when the organization of the Republic of Delaware and the sale to Republic Iron of the 1,000 shares in consideration of the 10,000 of Gulf, 22,272 of Inland and $400,000 in cash was ratified and approved.

The second meeting of Republic of Delaware was held on April 4, 1930, at which time the directors were E. T. McCleary, W. R. Burwell, L. G. Watson, Roland J. Lehman, and William Belden. At this meting the Board of Directors, with Mr. Belden absent, adopted a resolution authorizing the borrowing of the $1,500,000 from Republic Iron to be paid within a period of six months from April 4, 1930, with interest at the rate of 5% per annum. Practically coincident with the adoption of the resolution authorizing the borrowing of $1,500,000 and as the next order of business, the board authorized the making of a loan of a similar amount to Industrial Shares for a period of six months, to likewise bear interest at the rate of 5% per annum, and to be secured by the pledge of 10,000 shares of the common capital stock of Youngstown Sheet & Tube. Though nothing appears in the minutes of Republic Iron authorizing this loan to Republic of Delaware, the testimony establishes that Mr. McCleary on April 3, 1930, caused said sum to be transferred to Republic of Delaware, and to be used in the purchase of 10,000 shares of Youngstown Sheet & Tube.

Through the course of the trial Republic of Delaware has repeatedly been designated as a "phantom" corporation organized solely as a conduit through which Republic of New Jersey was to be mulcted by the defendant directors. The testimony fails to establish the truth of the claim so made. On the contrary the evidence does establish that there was no concealment of the creation and existence of the subsidiary corporation. Complete records were kept of its business deals and the mutual credits and debits existing between it and Republic Iron and later Republic of New Jersey appeared upon the books of the respective companies.

The evidence establishes that on April 4, 1930, when the $1,500,000 transaction was negotiated, William G. Mather, E. B. Green, George B. Humphrey, Myron Wick, and Philip Wick, were directors of Republic Iron and that the defendants T. M. Girdler, J. O. Eaton, H. A. Raymond and F. H. Hobson were not directors at the time the transaction was effected but did subsequently become directors of Republic of New Jersey into which Republic Iron was merged. These latter defendants are not charged with any liability growing out of the making of the loan, but the charges against them as well as against the other five directors are joined in the claim that they were negligent in failing to collect and to rescind the loan, and in their act of surrendering on May 12, 1931, 25,000 shares of Harbison & Walker in exchange for 10,000 shares of Youngstown Sheet & Tube.

The testimony establishes that when knowledge was acquired that Bethlehem was to enter into a merger agreement with Youngstown Sheet & Tube a number of the leaders in the steel industry, particularly Mr. McCleary, the president of Republic Iron, and Cyrus Eaton, were of the opinion that the position of Republic Iron would be materially prejudiced by the merger of Youngstown and Bethlehem. In Mr. McCleary's opinion the investment and

the benefits to be derived if the merger were blocked were of such value that a purchase of 10,000 shares of Youngstown Sheet & Tube stock was necessary and advisable.

Cyrus Eaton was a leading figure in this fight. He was practically the sole owner of the stock owned by Industrial Shares, Inc. He also was interested in Continental Shares. The testimony establishes that in a conversation with Cyrus Eaton, Mr. McCleary agreed that Republic Iron would purchase 10,000 shares of Youngstown Sheet & Tube which was then being quoted on the stock exchange at $150 per share.

Thereafter on April 4, 1930, Mr. McCleary, without the knowledge of Wm. G. Mather, E. B. Green, George B. Humphrey, Myron Wick and Philip Wick, caused Republic Iron to purchase 10,000 shares of Youngstown Sheet & Tube for $1,500,000. The initial act in the proposed purchase occurred on April 3, 1930, when a check for $1,500,000 was issued by Republic Iron, and with it 10,000 shares of Youngstown Sheet & Tube were purchased from Otis & Company. After this purchase was made E. T. McCleary concluded that for business reasons it would be inadvisable and embarrassing for Republic Iron to appear externally as the owners of 10,000 shares of Youngstown Sheet & Tube, while they were actively being used in the merger fight. Consequently it was determined that instead of the stock being purchased by a subsidiary of Republic Iron the latter would loan $1,500,000 to Industrial Shares, and as security for the loan would take back the aforementioned 10,000 shares of Youngstown Sheet & Tube. The proof definitely establishes that the first security pledge on April 4, 1930, for the loan of $1,500,000 was 10,000 shares of Youngstown Sheet & Tube, thus indicating that the pledging of the Harbison & Walker was not originally contemplated.

However, after this plan of participating in the merger fight was conceived, Mr. McCleary decided that even such a set-up would be embarrassing, and might subject Republic Iron to criticism, and he then suggested to In-dustrial Shares that the latter make arrangements to exchange 10,000 shares of Youngstown Sheet & Tube for some other stock to be posted as security for the debt. On April 7, 1930, the agreement was made that Industrial Shares would borrow from Continental 25,000 shares of Harbison & Walker and as security for their return would place 10,000 shares of Youngstown Sheet & Tube. The transaction between Continental Shares and Industrial was consummated on April 7, 1930, though the resolution of Continental Shares authorizing the exchange was ante-dated to April 4, 1930, and read as follows:

"The proper officers of this company for the effect are hereby authorized to lend 25,000 shares of the common capital stock of Harbison & Walker Refractories Company to Industrial Shares, Inc., a Delaware corporation, upon the receipt of 10,000 shares of common capital stock of the Youngstown Sheet & Tube Company as security for such loan. As compensation for making the aforesaid loan of its stock Continental Shares, Inc., shall receive the right and option to purchase 10,000 shares of common stock of Youngstown Sheet & Tube Company from Industrial Shares at a price of $150 per share at the expiration of six months from April 4, 1930."

Though this mode of participation in the merger fight was finally adopted on April 7th, the note and the instrument evidencing the loan of Delaware to Industrial Shares was dated April 4, 1930. Great importance has been attached to the conflict in the dates. I am convinced from the evidence that the note from Industrial Shares to Republic of Delaware was ante-dated to obviate the necessity of calculating the interest which accrued between April 4, 1930, and April 7, 1930, and the necessity of either adding the interest to the principal or paying it outright to Republic of Delaware in the event the correct date of the transaction, April 7th, was used.

After McCleary's death, the president, T. M. Girdler, on June 17, 1930, learned of the transaction and informed the other directors about its existence and about the pledge of the 25,000 shares of Harbison & Walker as security for the loan. On this date of June 17, 1930, on the basis of the per share price the 25,000 shares of Harbison & Walker were worth $1,375,000. On April 14, 1930, they were worth about $1,600,000. On April 25, 1930, about $1,750,000. During the whole month of May it had an aggregate value of more than $1,500,000 and on the basis of the per share price on the stock exchange, but by June 17, 1930, when T. M. Girdler and the directors learned of the loan, the stock on the per share basis of valuation had fallen to $1,375,000.

When the directors learned of the existence of the loan, they promptly pressed Industrial Shares for either its payment or the posting of further security to insure the eventual collection of the debt, but by this time Industrial Shares had become financially involved. The 25,000 shares of Harbison & Walker had declined in value from $1,750,000 on April 25, 1930 to $1,250,000 on July 1, 1930.

On and after June 17, 1930, while the directors were considering the advisability of selling the security, they learned that the note of Industrial Shares given to Republic of Delaware as evidence of the indebtedness, contained no provision giving Republic of Delaware the legal right prior to the maturity of the note to sell the security in the event it depreciated in value to a point when it no longer adequately secured the debt. Thus the directors between June 17, 1930, and October 4, 1930, were not in the legal position to sell the security even though in their judgment under the circumstances such a course should have been followed.

On October 4, 1930, the obligation of Industrial Shares to Republic of Delaware became due, and Republic of Delaware, in pursuance to law but not to any of the provisions in the note, was vested with the right to liquidate the security and apply the proceeds thereof to the payment of the indebtedness. No provisions were contained in the note prescribing the mode under which the security was to be sold nor stipulating the rights of Republic of Delaware to purchase the security at such sale, whatever the legal methods of sale might be. Though the note matured on October 4, 1930, the 25,000 shares of Harbison & Walker were not sold because the directors decided that the security had fallen on the stock exchange to a price so low that it would be imprudent to sell. In their opinion a reasonable probability existed that the Harbison & Walker stock would regain its normal value on the stock exchange, and eventually would reach again a price sufficient to either completely or substantially discharge the debt.

But in May of 1931 a new and unexpected situation arose in which the management of Continental Shares passed from its directors to the representatives of the Cleveland banks. When these representatives learned of the existence of the loan agreement between Industrial and Continental, they demanded from Delaware the 25,000 of Harbison-Walker and tendered the return of the 10,000 Youngstown Sheet & Tube. The directors, perplexed by the new problem which involved a practical as well as a legal question, consulted with and received the opinion of their legal counsel, Mr. Belden.

Mr. Belden's integrity and ability has generally been extolled by all of the counsel participating in the trial of this case. In response to the request for advice on the legal questions involved in the demand made by Continental for the return of the 25,000 shares of Harbison-Walker, Mr. Belden transmitted to Mr. Girdler, as president of Republic of New Jersey, a letter with the following context:

"Dear Mr. Girdler: We have transmitted to you the papers covering the settlement with Industrial, Inc., and Continental Shares, Inc., and I am writing this letter to place upon your record the careful statement of the reason for asking for this settlement.

"When you became Chairman of Republic Steel Corporation of New Jersey and president of Republic Steel Corporation of Delaware, you found among the assets of the company a note from Industrial Shares, Inc., for $1,500,000, dated April 4, 1930, secured by 25,000 shares of Harbison-Walker stock.

"During the summer of 1930 the market value of Harbison-Walker stock declined and you endeavored to secure payment of this note, or, in lieu thereof, additional collateral, but were unable to accomplish either result. When this note became due in October, Industrial paid the interest and asked Republic to accept a renewal. Republic did not accept the renewal, but carried the past due note, and on April 3, Industrial made a second payment of interest, which two payments amounted for the year to $75,000.

"It appears that when Industrial first made this loan it was evidenced by a note secured by 10,000 shares of Youngstown Sheet & Tube Company common stock, but that at the request of Republic Steel Corporation of Delaware this collateral was changed to Harbison-Walker stock which Industrial Shares obtained by a borrow and loan arrangement entered into with Continental Shares, Inc., by due authority from that company, under which Continental loaned Industrial the Harbison-Walker stock and received the Sheet & Tube stock from Industrial as security for the loan of the Harbison-Walker stock.

"Continental Shares, Inc., recently demanded the return of this Harbison-Walker stock. We found there were some differences of recollection and understanding as to the circumstances under which this loan was made, that is, this is relating more particularly to Industrial Shares, Inc., and Republic Steel Corporation of Delaware. After careful and extended investigation of all the correspondence and corporate records with reference to this matter and personal interviews with anyone having any knowledge of the subject we have reached the conclusion that it would be for the best interests of Republic to make the general settlement

and compromise covered by the papers which we have transmitted to you. In making this settlement we also took into consideration the relation of the Republic to the Cleveland Trust Company and other banks holding the loan of the Republic Steel Corporation of Delaware, on which additional collateral had been demanded."

The minutes of the meeting of May 12, 1931, also record a lengthy report on the subject made by the president, Mr. Girdler:

"The President stated that Continental Shares, Inc., had made a demand upon the corporation for delivery to it of 25,000 shares of the common capital stock of Harbison-Walker Refractories Company, which were held by the corporation as collateral to the note of Industrial Shares, Inc., for $1,500,000, dated April 4, 1930; that accordingly he had made an investigation into the facts relating to such note and its collateral, the transactions involved having all occurred prior to his connection with the corporation or with Republic Steel Corporation; that as a result of his investigation it appeared that the note of Industrial Shares, Inc., was originally secured by 10,000 shares of the common capital stock of the Youngstown Sheet & Tube Company; that the corporation had requested Industrial Shares, Inc., to substitute other collateral for the time being for said shares of the Youngstown Sheet & Tube Company; that in accordance with this request from Continental Shares, Inc., said 25,000 shares of the common capital stock of Harbison-Walker Refractories Company and caused the same to be deposited with the corporation as substituted collateral for said note, and that as security for such loan of stock, Continental Shares, Inc., had received said 10,000 shares of the common capital stock of the Youngstown Sheet & Tube Company, under an arrangement that, upon demand, said 25,000 shares of the common capital stock of Harbison-Walker Refractories Company would be returned to it against its surrender of said 10,000 shares of the common capital stock of

the Youngstown Sheet & Tube Company; that in accordance with such arrangement Continental Shares, Inc., had made such demand upon the corporation and also upon Industrial Shares, Inc.

"The President further stated that the corporation was embarrassed with reference to the Industrial Shares note because of the fact that it did not contain the power of sale provisions and other provisions usual to collateral notes; that he had taken this matter up with the officers of Industrial Shares, Inc., and requested that the note be amended so as to contain the usual power of sale provisions, with authority to the corporation to become the purchaser of the collateral at a sale by it over a brokers' board or a public sale conducted by it, and had obtained an arrangement with the officers of Industrial Shares, Inc., by which the note would be amended so as to contain the desired provision, at the same time duly specifying the Youngstown Sheet & Tube Company stock as the collateral thereto, and Industrial Shares, Inc., would assure to the corporation the receipt of the dividends which have accrued on the Youngstown Sheet & Tube Company stock as dissenting stock in the proposed Youngstown Sheet & Tube Company-Bethlehem Steel Corporation merger, as well as future dividends, or any among which may be awarded as interest upon the fair value of the dissenting stock in the appraisal proceedings, as well as such fair cash value, providing this corporation would release Industrial Shares, Inc., from the further payment of interest on its note and from any deficiency on the note over and above the amount realized from the collateral, such arrangement to be evidenced by proper instrument to be delivered at the same time that the corporation surrendered to Continental Shares, Inc., the 25,000 shares of the common capital stock of Harbison-Walker Refractories Company and receive back the original collateral consisting of the 10,000 shares of the common capital stock of the Youngstown Sheet & Tube Company, now represented by certificates of deposit issued under the Youngstown Sheet & Tube Company Dissenting Stockholders Protective Agreement, dated September 10, 1930. He further said that an arrangement had been made under which, in event the cash value of such Sheet & Tube stock were not fixed and determined by court procedure or otherwise, and paid, so that instead of getting cash for such Sheet & Tube stock, the corporation would have merely the status of a stockholder of the Sheet & Tube Company, Continental Shares, Inc., would reimburse one-half the expenses of the Protective Committee, applicable to such stock.

"The President further said that the arrangement which he had outlined had seemed to him advantageous to the corporation, particularly in view of the fact that Industrial Shares, Inc., was hopelessly insolvent and any claim for further interest or deficiency of the note was worthless, and accordingly, he had entered into the arrangement described.

"He then presented to the meeting copy of a letter to The Cleveland Trust Company, dated May 11, 1931, approved by Industrial Shares, Inc., and Continental Shares, Inc., authorizing the delivery to Continental Shares, Inc., of said 25,000 shares of the Harbison-Walker Refractories Company common stock simultaneously with the delivery to the corporation of certificates of deposit representing said 10,000 shares of the Youngstown Sheet & Tube Company common stock as collateral under the Industrial Shares note; copy of a letter from Industrial Shares, Inc., to the corporation, dated May 11, 1931, amended the note so as to refer to the 10,000 shares of the Youngstown Sheet & Tube Company common stock as collateral and so as to incorporate the power of sale and other provisions; and copy of a letter from Industrial Shares, Inc., to this corporation, providing for this company to receive the dividends accrued or hereafter declared on said Sheet & Tube Company stock, or any amount awarded as interest on the fair cash value of such stock, as well as receiving such fair cash value; and on motion said papers were ordered filed

in the records of the corporation, marked respectively Exhibits A, B and C of this meeting."

Following the receipt of Belden's letter and Mr. Girdler's report, and upon consideration of the entire problem, the directors, in pursuance to the resolution hereinafter quoted, decided to surrender the Harbison-Walker stock and accept in lieu thereof the Youngstown Sheet & Tube stock.

"Thereupon, on motion of Mr. Greene, seconded by Mr. Wick, the following resolution was duly offered, seconded and unanimously carried.

"Resolved that the Board of Directors of Republic Steel Corporation of Delaware hereby approve the action of the President in releasing to Continental Shares, Inc., 25,000 shares of the common capital stock of Harbison-Walker Refractories Company heretofore held by the corporation as collateral to the note of Industrial Shares, Inc., to the corporation for $1,500,000 dated April 4, 1930, receiving from Continental Shares, Inc., certificate of deposit issued under the Youngstown Sheet & Tube Company Dissenting Shareholders Protective Agreement, dated Sept. 10, 1930, representing 10,000 shares of the common capital stock of the Youngstown Sheet & Tube Company, the original collateral for said note and also approves the action of the President in working out the transaction outlined by him with Industrial Shares, Inc., relative to the amendment of said note, so as to include a power of sale and providing for the waiver of further interest and of any deficiency thereon and specifically approve the execution and delivery of the paper, dated May 11, 1931, copies of which were presented to this meeting and ordered filed in the records of the corporation, marked Exhibits A, B and C, * * *'"

With the adoption of the aforementioned resolution the exchange of the Harbison & Walker stock for the Youngstown Sheet & Tube stock was made and concluded.

ARE THE DIRECTORS MATHER, GREEN, HUMPHREY, MYRON WICK AND PHILIP WICK LIABLE UNDER THE CLAIM THAT THEY WILFULLY DELEGATED, AS DIRECTORS OF REPUBLIC STEEL OF NEW JERSEY, THE PERFORMANCE OF THEIR DUTIES TO E. T. McCLEARY, W. R. BURWELL, L. G. WATSON, ROLAND J. LEHMAN AND WILLIAM P. BELDEN, THUS MAKING POSSIBLE THE CONSUMMATION OF THE TRANSACTION WITH INDUSTRIAL SHARES, INS.?

This claim is based primarily upon the fact that the $1,500,000 transaction was negotiated between Republic of Delaware and Industrial Shares.

Though I have previously herein specifically held that the proof does not establish that Mather, Green, Humphrey, Myron Wick and Philip Wick delegated the performance of their duties to Belden, McCleary, Lehman, W. R. Burwell and L. G. Watson, nor that the defendant directors of Republic of New Jersey had any knowledge of the decision that E. R. McCleary made to participate in the merger fight between Bethlehem and Youngstown Sheet & Tube, I shall nevertheless discuss the legal and factual situation that exists respecting that claim.

Elmer T. McCleary was president of Republic of Delaware and of Republic of New Jersey. Mr. Belden was a director of Republic of Delaware and also general counsel of Republic Iron & Steel. It is true that the other three directors were associated with Industrial Shares and Continental Shares, whose 25,000 shares of Harbison-Walker eventually were used to secure the loan, but it must not be forgotten that although in nominal form the transaction appeared to be with Industrial Shares, the true fact is that the transaction was given the outward appearance of a loan solely with the intention of concealing the participation of Republic Iron & Steel in the fight against the merger of Bethlehem and Youngstown. Neither Watson, Lehman nor Burwell initiated the thought to borrow the $1,500,000 from Republic of Delaware.

The entire transaction was negotiated and conceived by E. T. McCleary. He was until that time respected for his ability and his knowledge of the steel industry and was supported by a long and successful career in the development of the iron business.

Though it now appears that his judgment to participate in the merger fight was bad and that his handling of the purchase of the 50,000 shares of Inland was at the least negligent, the evidence fails utterly to establish that on the basis of the circumstances as they existed on April 4, 1930, and the knowledge then posssessed by him and those intimately connected with the steel industry that the course he chose to follow about the merger was either wrong or the result of a negligent and careless attention to his duties.

The plaintiffs vigorously urge that the act of allowing Burwell, Watson and Lehman to officiate as members of the Board of Directors of Republic of Delaware, establishes negligence on the part of the five defendants. The plaintiffs urge that inasmuch as Burwell, Watson and Lehman were associated as directors and officers with Industrial Shares and Continental Shares it constituted negligence to allow them to remain on the Board of Directors of Republic of Delaware, the subsidiary of Republic Iron & Steel.

In the first place the defendants did not know of the presence of Burwell, Watson and Lehman on the Board of Directors of Republic of Delaware, but even though they did, the honesty, ability and integrity of these men as far as it was known to the five defendant directors prior to April 4, 1930, was of a character that their presence upon the Board would not in and of itself warrant the charge of negligence against them.

Though Burwell, Watson and Lehman had positions which carried a duality or triplicity of adverse interests, that fact alone does not warrant the conclusion that there was an improper delegation of duties to them. The plain-

tiffs' claim in substance that the presence of Burwell, Watson and Lehman on the Board of Republic of Delaware raises a presumption that the defendant directors were negligent and acting in bad faith, but no legal authority is submitted holding that either of such presumptions may be drawn.

Though plaintiffs argue that had the directors of Republic of Delaware not occupied positions which carried a relationship of adverse interests that they would have opposed the transaction, the proof does not substantiate the claim that the participation of Republic Iron & Steel in the merger fight was either the consequence of negligence or of a plan of any individual to profit through the participation.

While transactions between corporations represented by directors having a duality of adverse interests are suppressed by the courts if bad faith, fraud, or an unfair advantage is perpetrated upon one in favor of the other, the law in Ohio seems to be well established that in actions for recission of such contracts, the fact that the directors are serving two masters whose interests are adverse does not raise any presumption of fraud or bad faith.

See **Brown & Stewart v United States Board & Paper Company** (Hamilton Circuit Court, 1900), **11 O. C. D. 102;** **Kern v Kraus Plumbing & Heating Company, 12 Oh Ap 55, 31 C. C. (N.S.) 42 (1919); Kleybolte v Railroad Co., Hosea '38 Aff'd. 18 O. D. 141, and 80 Oh St 311 (1909) and Lake Hiawatha Park Association v Knox County Agricultural Society, 28 Oh Ap 289; 162 N. E. 653 (1927).**

The presence or absence of negligence on the part of the defendants in connection with the delegation of duties must be determined upon the ability, integrity and character of Watson, Burwell and Lehman and McCleary, as it was known at the time they took their office and acted upon the $1,500,-000 transaction.

In the case before the Bar, viewing the transaction in the light of the circumstances that existed on April 4, 1930,

the plaintiffs failed to establish by a preponderance of the evidence that Mather, Green, Humphrey, Myron Wick and Philip Wick were negligent even though the proof had established that they wilfully selected Watson, Burwell and Lehman as directors of Republic of Delaware. The testimony fails to establish that Watson, Burwell or Lehman or McCleary were either negligent or that they purposely sacrificed the rights or took unfair advantage of Republic of Delaware. The most that can be said is that they concurred and cooperated with McCleary in his judgment and did not resist his policy respecting the part that Republic Iron & Steel was to play in the merger fight. The position of McCleary and his reputation in the iron industry, and the interest that Republic Iron & Steel had in resisting the merger, in my opinion, warranted Burwell, Watson and Lehman to respect McCleary's judgment and if in good faith they concurred with him, to absolve them from the charge of misconduct even though their concurrence in his judgment subsequently proved to be wrong. By this I do not mean that they as directors were free to surrender their duties but in coming to their decision they had the right to counsel with and consider the judgment of their fellow directors.

It is, therefore, my finding of fact that even though Mather, Green, Humphrey, Myron Wick and Philip Wick had known of the presence of Burwell, Lehman and Watson on the Board of Directors of Delaware, that even on that summed state of facts the directors of Republic Iron & Steel were not negligent in allowing them to act as directors of Republic of Delaware.

WERE OR WERE NOT THE DEFENDANT DIRECTORS NEGLIGENT BECAUSE THEY DID NOT INSTITUTE AN ACTION IN EQUITY TO RESCIND THE TRANSACTION UNDER WHICH THE $1,500,000 WAS TRANSFERRED TO INDUSTRIAL SHARES, INC.?

To answer this question it must first be determined whether from the established facts Republic of Delaware was in the legal position where it could successfully in equity prosecute a suit to cancel **ab initio** that transaction.

Secondly, if a suit from a legal standpoint could be maintained would the practical results of the suit be of such a nature as to improve the financial position of Republic of Delaware? My findings on fact surrounding that transaction have already been expressed herein. In a suit for rescission the burden of proof would have rested upon Republic of Delaware to establish that a fraud was perpetrated upon or an unfair advantage taken of it by the transfer of $1,500,000 to Industrial Shares. The proof establishes as already pointed out that three of the officers of Republic of Delaware at the time the transfer was made were either officers of Industrial Shares, Inc., or of Continental Shares, Inc.

The fact that a number of the directors were serving two masters in the consummation of that transaction would not in and of itself have warranted the granting of relief by way of cancellation. Republic of Delaware in the least would have had to establish that the transaction was unfair and was tantamount to a fraud upon it.

See **Brown & Stewart v United States Board & Paper Co., 11 O. C. D. 102; Kern v Krause Plumbing & Heating Co., 12 Oh Ap 55; 31 C. C. (N.S.) 42 (1919); Kleybolte v Railroad Co., Hosea 38 aff'd 18 O. D. 141 and 80 Oh St 311 (1909); and Lake Hiawatha Park Assn. v Knox Co. Agricultural Society, 28 Oh Ap 289, 162 N. E. 653 (1927).**

Confronted with the foregoing rule it is my opinion that the Republic of Delaware was in no position to show that the $1,500,000 transaction was the consequence of a fraud practiced upon it by Industrial Shares, Inc. On the contrary, if an action in cancellation had been brought the proof would have established that Industrial Shares, Inc., acted merely as a nominal medium through which Republic Iron & Republic of Delaware participated in the fight to prevent the merger of the Youngtown Sheet & Tube, and Bethlehem Iron & Steel.

It is consequently my finding of fact that the failure of the directors to institute a suit in rescission ▮▮▮▮▮▮▮ did not constitute negligence, but that their judgment was reasonable and corresponded to the conclusions that would have been reached by reasonable men studying that problem.

However, assuming that the prosecution of a suit in rescission based upon the facts could have been successfully maintained, what then would have been the status of Republic of Delaware and Republic of New Jersey? The rule in equity seems to be that a defrauded party seeking affirmative equitable relief before bringing a suit is not required to restore or offer to restore what he has received in the transaction, but the court, as a pre-requisite to the granting of the relief in rescission will require the plaintiff seeking equity to do equity.

When a defrauded party seeks to rescind he must do so **in toto.** Equity will not permit him to divide the contract, availing to himself the benefits and rejecting the burdens. If the general rule would have been applied to the assumed action brought by the Republic, then as a condtion to the granting of relief Republic would have had to restore to Industrial Shares the 25,000 shares of Harbison & Walker, while Industrial Shares redelivered to Republic of Delaware the $1,500,000.

Industrial Shares concededly was in no financial position to pay the $1,500,-000 because that money was expended by Republic of. Delaware in pursuance to McCleary's instructions in the purchase of 10,000 of Youngstown Sheet & Tube. With the facts conceded that Industrial Shares was unable to make restitution of the $1,500,000 what conditional relief could have been granted by a court of equity? Undoubtedly Republic of Delaware, unless the $1,500,000 was restored would under no circumstances have been willing to release the 25,000 shares of Harbison & Walker. If it is true that the retention of Harbison & Walker was the prudent and judicious thing to do, by what legal or equitable authority could Republic of

Delaware retain the Harbison & Walker and yet sue for cancellation? The court in the equitable action on authority of **Jones v Draper, 40 C. C., N.S. 105,** might hold that the Republic of Delaware was entitled to the judgment and entitled to retain either the 10,000 shares of Youngstown Sheet & Tube or the 25,000 shares of Harbison & Walker as a lien for the payment of the judgment. Such a result, however, would have placed Republic of Delaware in the identical position that it occupied in the absence of the suit for concellation. Republic of Delaware would then have been obligated to sell the Harbison-Walker or the 10,000 shares of Youngstown Sheet & Tube in accordance with the provisions of law either at public or judicial sale.

It is very probable that if the results of a proceeding in equity for rescission were to be identical with those obtained in an action at law for damages, that a court of equity, supported by extensive legal authority, would have declared that the Republic of New Jersey had an adequate remedy at law, and therefore was not entitled to relief. However, assuming that the action in equity was upon the true facts maintainable, the decree of the court, if it did impress a lien upon whichever stock was found to be the actual security, would have ordered a sale of the collateral on execution to satisfy the lien. Thus the results obtained in the action for rescission would have permitted Republic of New Jersey to have the stock sold on execution, while, in the absence of such an action the security would have had to be sold at public sale.

Under the authorities in Ohio at such a public sale Republic of New Jersey, the pledgee, would have been precluded from being the purchaser.

See **Glidden v Mechanics' National Bank, 53 Oh St 588, 42 N.E. 995; 32 O. Jur.** 45; 76 A. L. R. 705; Jones on Collateral Securities, Sec. 275.

With Republic of New Jersey being unable to purchase at the public sale, it is obvious that there was no method of protecting itself against the stock,

being sold at a sacrifice. In the event the entire block or parts of it were sold on the stock exchange, there could not have existed a reasonable assurance that the net result would have been more profitable to Republic of New Jersey than that which might have been obtained through a delay of the sale granted in the reasonable expectation that the stock would eventually resume the value on the exchange sufficient to completely or substantially satisfy the debt.

A sale at public auction, just as a sale on the stock exchange would have been surrounded with the ordinary hazards and perils that accompany a forced sale.

In 1938, while the issues in this case are being tried, and now having in mind the price changes that have occurred in the stock market quotations of the Harbison-Walker stock, and the Youngstown Sheet & Tube, covering the period beginning on April 4th, 1930, and running down to the present date, it is a simple matter for counsel for the plaintiffs to state that it would have been financially better for the Republic of New Jersey, first, never to have made the loan, and, secondly, to have made a sale of the pledged stock on Oct. 4, 1930, on the date when the $1,500,000 loan became due.

This judgment of the plaintiffs that what the directors did in 1930 and 1931 was negligent, however, is not based upon the isolated knowledge of the circumstances as they existed only in 1930 and 1931, but upon a very thorough study that has been made of the changes that have occurred in the price of Harbison-Walker and Youngstown Sheet & Tube stock during the last eight years.

The defendant directors in 1930 and 1931 were without knowledge of what the business and economic conditions of the country would bring in succeeding years. The plaintiffs and their counsel, however, at this time fortified with detailed graphs of the rises and falls of the various stocks have outlined a course of conduct which they in their present opinion suggest should have been meticulously followed by the directors in the year of 1930 and 1931. It is needless for me to say that there are within this country thousands upon thousands of reasonable minded business men and individuals who, had they in 1930, known about the future change in the value of stocks and other investments, would have followed at that time a course entirely different and one which would have left them in a tremendously improved financial position today.

The perfect judgment expressed by the plaintiffs has its roots in a knowledge acquired out of past established facts and not in the uncertainties of what the future would bring. For the directors in 1929 to have known equally what counsel for plaintiffs knew in 1938 about the business, economic and stock market changes embraced in these nine years would have required those directors to be gifted with a supernatural power. When the passing of time has established the wisdom or folly of our past acts it is with ease and certainty that we are able to precisely say what our conduct should or should not have been. When, however, we are presently required to form judgments of the future we can only be expected to reach such reasonable conclusions as are indexed by our experience of the past.

The business and stock market calamity that came in the Autumn of 1929, the slight rise in the spring of 1930 and the precipitous fall that followed, was unprecedented in our history and of such abnormality that the most judicious business man, based upon experiences of the past, could not have anticipated them in evaluating the business conditions of the future. The present impeccable judgment of the plaintiffs is born not of foresight, but of hindsight, and obviously cannot be used as the guide which reasonable and normal human beings could have followed in 1929, 1930 and 1931.

Respecting the claim of the plaintiffs that the defendant directors were negligent in their failure to rescind the transaction and their failure to sell the stock after they were vested with

the right to do so upon the maturity of the note, it is my finding of fact that the judgment exercised and the course followed was not negligent even though today it is obvious that had a different course been followed it would have been financially profitable to the corporation.

WERE OR WERE NOT THE DEFENDANT DIRECTORS NEGLIGENT WHEN ON MAY 11, 1931, THEY VOLUNTARILY EXCHANGED THE 25,000 SHARES OF HARBISON & WALKER STOCK FOR THE 10,000 SHARES OF YOUNGSTOWN SHEET & TUBE AS COLLATERAL FOR THE PAYMENT OF $1,500,000 LOAN?

Some time prior to May 12, 1931, the management and control of Continental Shares passed from the hands of its directors into those of the representatives of banking enterprises interested financially and otherwise in its affairs. When the new directors took charge they discovered that as of April 4, 1930, a borrow and loan agreement was instituted with Industrial Shares in pursuance to the resolution hereinbefore set forth.

The proof establishes that when the borrow and loan arrangement was made Harbison & Walker and Youngstown Sheet & Tube stock were selling on the stock exchange at the respective prices of $60 and $150 per share. On May 12, 1931, the per share stock exchange quotations of Harbison & Walker and Youngstown Sheet & Tube were respectively $27 and $53 per share. The plaintiffs contend that Republic of Delaware after the maturity of the note unquestionably became vested with all of the legal rights of an unpaid pledge. They assert that even though the 25,000 shares of Harbison & Walker were not legally owned by Industrial Shares, the latter company under the provisions of the loan arrangement made with Continental Shares on April 7, 1930, had the full and complete power to pledge the Harbison & Walker shares with Republic of Delaware. On the other hand all of the defendant directors contend that when Continental Shares demanded the 25,000 shares

of Harbison & Walker and offered to return the 10,000 shares of Youngstown Sheet & Tube they were uncertain about the legal right of Republic of Delaware to retain the security and that they thereupon sought and received the advice of their general counsel respecting the course of conduct to be followed in treating the problem presented by the demand; that they considered the practical business problem created by the demand to surrender the Youngstown Sheet & Tube for the Harbison & Walker in connection with the advice obtained by them from their counsel respecting the reasonable probability of resisting a suit by Continental Shares to recover the Harbison & Walker, and that acting in good faith and with prudence they determind in their best judgment that the exchange should be made. It is apparent that the Board of Directors on May 12, 1931, had to decide:

(a) Whether the then relative value of Harbison & Walker and Youngstown Sheet & Tube was of a character to warrant from a business and financial standpaint the surrender of the Harbison & Walker stock in exchange for the Youngstown Sheet & Tube.

(b) That if from a business and financial standpoint the surrender ought not to be made whether the probable consequences of litigation resisting the demand of Continental Shares would prove successful to Republic of Delaware.

The first question definitely was a problem addressed to the discretion of the Board of Directors circumscribed, however, by the duty of exercising good faith and reasonable care to serve the best interests of Republic of Delaware.

The second question in the final analysis also had to be answered by the Directors and inasmuch as it involved a determination of legal problems, it demanded and required the advice of legal counsel. Counsel for the defendants, in part, attempt to justify the exchange on the basis that the evidence, independent of the legal questions involved, does not establish that the directors were negligent in taking 10,000 shares of Youngstown Sheet & Tube as se-

curity in substitution for the 25,000 shares of Harbison & Walker, though the latter shares on that date had a value of $137,500 in excess of the 10,000 shares of Youngstown Sheet & Tube. Respecting the relative aggregate value of Harbison & Walker and Youngstown Sheet & Tube, counsel for the plaintiffs take the position that the per share price of the stock on the exchange of the two securities is the sole criterion of determining their market value; while counsel for the defendants contend that large blocks of stock cannot be evaluated on the basis of multiplying the number of shares in the block by the per share market quotation.

Independently of the cases cited by the defendants it seems illogical and unreasonable to evaluate a small, and a particularly large block of stock on the basis of the extravagantly high prices of a boom period or the shockingly low prices of a depressed period, for which a particular stock is sold on the stock exchange. Experience has clearly indicated that the market value of stock as reflected on the exchange, particularly in abnormal boom and depression periods does not constitute a safe standard in measuring the value of securities.

In condemnation proceedings tried in the period beginning in 1929 and practically down to the present day of November, 1938, if the market value of the property involved were to be determined solely on the basis of for what other properties in the immediate vicinity were selling, the inevitable result would have been that the evaluation of the property would have had no relation to its true value.

In the case before the Bar the testimony establishes that Inland stock on August 26, 1929, was selling at $113 per share. From the high price of $113 per share on August 26, it gradually declined until October 28, 1929, when it suddenly and precipitously fell from $92 to $80 per share. Thereafter it continued declining until it reached $70, the low of the year, on December 31, 1929. Inland shares in the course of one day, on October 29, fell 12 points and in the period beginning August 26, 1929, when it was selling at $113, and ending December 31st, when it was selling at $70, dropped 43 points. Except for the fear that suddenly seized the investors there was no immediate, tangible and palpable reason for the precipitous decline of that stock.

The rule expressed by the weight of authority seems to hold that directors cannot be held liable for negligence solely on the fact that they bought large blocks of stock at prices above or sold large blocks of stock at prices below the stock exchange prices established by the sale of comparatively few shares.

In Cleary v Higley, 277 N.Y.S., **63** (1934) the Court said:

"The proof of market value of a small number of shares is obviously no criterion to establish the value of a tremendous block of one million six hundred thousand shares which were twice as many as were then on the market."

In Heiner v Crosby, 24 Fed. (2) 191, appears the following statement:

"The fair market price or value of stock at a particular time is a question of fact, to be determined from all the circumstances. Market price implies the existence of a market, of supply and demand, of sellers and buyers. Sales are always evidence of a market price, but the statute requires that in 'ascertaining the gain derived from the sale,' there must be not simply a 'market price', but a 'fair market price'. Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value.

"The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either statutory fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market, may neither signify a fair

market price or value, nor serve as the basis on which to determine the amount of gain derived from the sale. In such cases resort must be had to evidence to determine 'fair value'. Offers made in good faith and opinions of intelligent men experienced in the business are admissible to show fair value. * * *"

See also Dougherty v Park, 274 Mich. 673, 265 N.W. 499 (1936); Hacker v Kyle, 211 Wisc. 586, 248 N.W. 134 (1933); Miller v Canton Motor Coach, Inc., 58 Oh Ap 94 (1937); Cleary v Higley, 277 N.Y.S. 63 (1934).

The cases hereinbefore cited holding that large blocks of stock cannot be appraised on the basis of the per share sales on the stock exchange indicate that in the final analysis the determination of the value is a question of fact to be decided not only upon the per share price of the stock on the exchange, but also upon all other circumstances reflecting its fair market value.

The Youngstown Sheet & Tube stock enjoyed a sudden abnormal rise at the time the fight was being waged against the merger of Youngstown Sheet & Tube with Bethlehem. The contesting forces were desirous of obtaining a sufficient number of shares to control the merger fight. To those who were interested in obtaining control, the shares were practically and legally worth more than to the purchasers in the ordinary market.

See Keir v McIntosh, as Commissioner, 28 B.T.A. 633 (1933); Helfman v American Light & Traction Co., 121 N.J.R. 1, 187 Atl. 540 (1935); Helvenny v Safe Deposit & Trust Co., U.S.C.C.A. 4, May 9, 1938, 11 Ch Ap 169 to 173.

However, the merger fight was practically ended before May 12, 1931, and the added value of the Youngstown Sheet & Tube reflected by its use in the control fight no longer existed. The extended investigation and the rather lengthy reports made by Mr. Belden to the Board of Directors and the report made by Mr. Girdler, both of which are hereinbefore set forth in this opinion, establish the fact that the Board of Directors knew that the surrender of the 25,000 shares of Harbison & Walker for the 10,000 shares of Youngstown Sheet & Tube was financially inadvisable and should not have been made, unless the answer to the legal question surrounding the initial borrow and loan agreement was of a character to endanger the safety of Republic of Delaware retaining the possession of the Harbison & Walker. What was the legal situation surrounding the right of Republic of Delaware to sell the stock?

Plaintiffs categorically state that Republic of Delaware on and after October 4, 1930, had the absolute and full right of an unpaid pledgee to sell in accordance with law the securities of the defaulted pledgor; while counsel for the defendants take the position that the legal right of Republic of Delaware to sell was not so clear and certain as to warrant the positive opinion that in the litigation of that subject the inevitable result would have been a confirmation of the pledgee's claim.

At the outset of the discussion of this subject it must be understood that the liability of the defendants does not depend upon the correctness or incorrectness of their judgment reached in good faith to return the Harbison-Walker stock to Continental Shares. They only can be held liable if the testimony establishes that their act was motivated by bad faith or was the consequence of a negligent consideration of the problem.

Clearly the demand created a situation which made it legally imperative for the directors to seek the advice of counsel. A director, when in doubt about the legal questions involved, who blindly attempts to exercise the functions of counsel, might well be charged with the failure to act as a reasonably prudent and careful person.

In Uffelman v Boillin, 19 Tenn. App. 1, 82 S.W. (2d) 545, (1935) the Court said:

"The true rule in this class of cases is, that if the Directors feel any doubts as to the law, they may be guilty of neglect if they fail to seek and be guid-

ed by competent legal advice, and this for the obvious reason that they would, under like circumstances, seek such advice in the management of their private affairs."

Of course, directors cannot hide behind the excuse that their acts were advised by counsel, when from all the circumstances it is clear and obvious to them that the course of conduct prescribed is not in accord with the manifest facts and the law.

See In re Westerfield, 53 N.Y.S. 251; Miller v Proctor, 20 Oh St 402; New Haven Trust Co. v Doherty, 54 A. 209.

I fail to observe, however, that the legal questions involved were of such simplicity that counsel was unnecessary. The factors to be considered by their counsel were not confined solely to the legal questions, but of equal importance was an investigation into the circumstances of the transaction to learn whether the application of the law to the ultimate facts would, with some reasonable certainty, insure a successful resistance of the claim made by Continental Shares.

It is the contention of the plaintiffs that the resolution under which the loan of the 25,000 shares of Harbison & Walker was made, legally imposed upon Industrial Shares merely the obligation to return the identical or any other 25,000 shares of Harbison & Walker stock, and that Industrial Shares became vested with the title to said shares enabling it to transfer said title to Republic of Delaware or anyone else.

Fosdick v Green, 27 Oh St 484; Chase v Washburn, 100 S. 244, 3 R. C. L. 45.

If the legal effect of the resolution was to create a mutuum between Continental Shares and Industrial Shares, then by authority of Fosdick v Green and Chase v Washburn, supra, the plaintiffs' contention respecting the ability of Industrial Shares to pass title is legally correct.

However, the circumstances surrounding the transaction were of a character that Mr. Belden in giving his advice might well have been in justifiable doubt about the ability to retain the collateral. If the proof had established that Republic of Delaware had knowledge of and was the motivating factor in effectuating the loan, and if the evidence had established that Republic of Delaware had for its own benefit procured Industrial Shares to borrow the 25,000 shares and that Industrial Shares was acting merely as a medium through which the Harbison & Walker was placed in the portfolio of Republic of Delaware, then a very serious question would have arisen respecting the title and interest of Republic of Delaware in the securities.

From the testimony that has been offered such contingency was not beyond the scope of reasonable probability.

The directors were therefore confronted with the possibility that their title of Industrial Shares was defective. If the relationship between Continental Shares and Industrial Shares was not that of a depositary and depositor, and if the title to the Harbison & Walker was defective and Delaware knew about it, what interest was then acquired by Delaware in the pledged securities?

Plaintiffs in their brief have quoted §§8673-1 and 8673-5 GC, which respectively provide:

"Sec. 8673-1. Transfer of title to shares. Title to a certificate and to the shares represented thereby can be transferred only,

(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or

(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign or transfer the same or the shares represented thereby signed by the person appearing by the certificate to be the owners of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person."

"Sec. 8673-5. When transfer of title by delivery effectual. The delivery of a certificate to transfer title in accord-

ance with the provisions of §8673-1 GC, is effectual, except as provided in §8673-7 GC, though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title."

But §8673-7, the provisions of which are expressly excepted from §8673-5 specifically provides insofar as it is pertinent to the question under discussion that:

"Sec. 8673-7. When certificate may be reclaimed and transfer rescinded. If the indorsement or delivery of a certificate,

(a) Was procured by fraud or duress, or

(b) If the delivery of a certificate was made;

(c) Without authority from the owner, or

(d) After the owner's death or legal incapacity, the possession of the certificate may be reclaimed and the transfer thereof rescinded, unless:

(1) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful."

32 O. Jur. 45, 76 A.L.R. 705.
Jones on Collateral Securities, Sec. 725.
Hanson & Fox v Friend, 10 Dec. 258.
Glidden v Mechanics Nat. Bank, 53 Oh St. 588.

Note must be taken that under §8673-7 GC, a good title to stock is not acquired by a purchaser when the endorsement or transfer is made by one without the owner's consent, except in those cases where the purchaser in good faith without notice and for value makes the purchase and so acquires the title.

Had Republic of Delaware succeeded in maintaining the validity of the pledge it is clear that it then had a right to sell the securities either on the stock exchange or at Public Auction.

The rule seems to be generally established that where a collateral loan agreement contains no express provisions specifying the mode of liquidating the securities that in such ▮▮▮▮▮▮▮ an event the sale must be public and the pledgee cannot purchase at such sale, or it may be, if the pledgee so desires, through a proceeding in equity to foreclose and sell the pledgor's interest in the pledge.

The uncertainty of the pecuniary consequences of such a sale need not be discussed because it is obvious that if the sale was on the stock exchange the stability of the market would control the results. And if at public auction, all of the disadvantages and hazards of a forced sale would be attendant.

Considering all of the contingencies Mr. Belden advised that the exchange be effectuated. In my opinion the relative difference in the value of the Harbison & Walker and Youngstown Sheet & Tube taken in connection with the uncertain results of contemplated litigation justified Mr. Belden in advising and the directors in following his advice that the settlement be made.

The plaintiffs complain further that the settlement released Industrial Shares of any deficiency judgment that might have resulted from the inadequacy of the substituted security to discharge the debt. An examination of the financial condition of Industrial Shares definitely establishes that with or without the release of Industrial Shares the net pecuniary result to Republic of Delaware could not be changed.

Plaintiffs rely upon Spregel v Beacon Participations Inc., 8 N.W. (2nd) 895, for their complaint against the release but an examination of that case will disclose that the facts and circumstances upon which the finding therein is made are not at all analogous to the case before this court.

But finally the soundness of the legal advice given is not derivative of the liability of the defendants in this action. Their liability depends upon whether from all the circumstances and the evidence, the plaintiffs have established that the defendants were either guilty of fraud, negligence, or whether they made secret profits out of the transaction.

In determining whether the defendants were negligent what importance shall be attached to advice that was given to them by counsel?

In re Joosts Est. 80 Wisc., 78, 100 N. Y. S. 378, 1906, the Court made this statement:

"The question, therefore, is not whether or not Mr. Greenhall's advice was correct as a matter of law, but was the executor, who in good faith sought such advice and followed it, discharging his duty by the estate, or was it his duty, upon the receipt of such advice, to disregard it and proceed to endeavor to collect this note? The executor is only required to bring to the discharge of his duties the intelligence which an ordinarily good business man would use in like matters; and where, in the course of the administration of his trust, he is confronted with any question which requires the advice of a skilled specialist and in good faith seeks such advice, receives the same, and acts thereon, he is not held accountable for the consequences of following it. And this is particularly true of intricate propositions of law. If, in spite of the advice of his counsel herein, he had persisted in instituting an expensive litigation for the purpose of endeavoring to realize upon this note, and the final result of the same had been disadvantageous to the estate, he would have been criticized for bringing such a fruitless action and would have been compelled to bear the expenses thereof himself."

I am of the opinion that the aforementioned quotation correctly states the case and is applicable to the case before the Bar.

See also **Baldwin v Egan, 11 O. C. C. (N.S.) 584;** and **Miller v Proctor, 20 Oh St 442;** Bailer v Babcock, 241 Fed. 501; Gilbert v Kolb, 85 Md. 627, Atl. 423; Stevens v Messerve, 73 N.H. 293; 61 Atl. 420, at 424 (1905); Brown v Ramsdell, 139 Wisc. 360, 249 N.Y.S. 387 at 394 (1931); In re Ball, 55 App. Div. 284; 66 N.Y.S. 874 (1900); Appeals of Hele, 132 Pa. 479, 19 Atl. 362, (1890).

Counsel for plaintiff charges the defendants with bad faith and in their brief, in part, argue:

"And if such a manifestly unsound legal opinion had been given, these bankers, lawyers and men of large affairs would not have followed it and could not in good conscience have done so."

This quoted charge, if it were true, would certainly be supported by circumstances or evidence showing a motive for the directors relinquishing deliberately the part of the assets of Delaware, in which they were heavily interested, to Continental Shares which at that time was under the practical control and management of its principal creditors. The record does not disclose wherein the surrender of the Harbison & Walker for a less valuable security would serve the interests of the directors or be of advantage to them in any respect whatsoever. While some of the directors were interested as stockholders in Continental Shares, the proof establishes that on the whole their major interest was in Republic of New Jersey the parent company of Republic of Delaware.

The finding of the Court is that the plaintiffs have failed to establish that any one of the defendants was negligent or acted in bad faith in connection with this act in approving the transaction under which the 25,000 shares of Harbison & Walker were surrendered and the 10,000 shares of Youngstown Sheet & Tube accepted in lieu thereof.

WAS OR WAS NOT THE DEMAND MADE BY THE PLAINTIFFS ON THE BOARD OF DIRECTORS OF REPUBLIC TO INSTITUTE THE ACTION SUFFICIENT TO PERMIT A STOCKHOLDER TO MAINTAIN ACTION FOR AND ON BEHALF OF HIMSELF, THE CORPORATION AND ALL OTHER STOCKHOLDERS SIMILARLY SITUATED?

The rule is well established that although a corporation holds the title to the corporate property, courts of equity

# 54

recognize the fact that the stockholders are ultimately the beneficiaries of the corporate possessions; hence in equity the rule has been accepted that when the corporate directors refuse to protect or recover its assets a stockholder after sufficient demand, will be permitted in a court of equity to sue in behalf of himself and other stockholders.

Pomeroy in Paragraph 1095, makes the following statement:

"Whenever a cause of action exists primarily in behalf of a corporation against directors, officers and others for wrongful dealing with corporate property the wrongful exercise of corporate franchise so that the remedy should regularly be obtained through a suit by and in the name of the corporation and the corporation **either actually or virtually refuses** to institute or prosecute such a suit, then in order to prevent a failure of justice an action may be brought and maintained by a stockholder or stockholders either individually or sued on behalf of themselves and all others similarly situated against the wrong doing directors, officers and other persons but it is absolutely indispensable that the corporation itself should be joined as a party, usually as a co-defendant. * * The stockholder does not bring such a suit because his rights have been directly violated or because the cause of action is his or because he is entitled to the relief sought; he is permitted to sue in this manner simply in order to set in motion the judicial machinery of the court. The stockholder either individually or as the representative of a class may commence the suit and may prosecute it to judgment but in every other respect the action is the ordinary one brought by the corporation. It is maintained primarily for the benefit of the corporation and the finding and relief when obtained belongs to the corporation and not the stockholder plaintiffs.

"The corporation is therefore an indispensable party not simply on the general principle of equity pleading in order that it may be bound by the decree but in order that the relief when granted may be awarded to it as a party to the record by the decree."

Manifestly in the absence of a virtual or actual refusal on the part of the Board of Directors to bring the suit a stockholder or stockholders would be without legal right to set the judicial processes in motion. The authorities uniformly hold that the petition of the stockholder in such actions must aver and at the trial it must be established by evidence that

(a) Either an actual demand to bring the action was made upon them and rejected by the Board of Directors; or,

(b) That the circumstances surrounding the action to be brought were of such nature that it was obvious that the Board of Directors could not initiate the suit because they as individuals were to be charged with wrong doing in the contemplated proceeding.

If it is apparent that the Board of Directors are penuriously or otherwise interested in the suppression rather than the maintenance of the suit and such facts are alleged in the pleading and proved at the trial an actual demand is excused.

A court of equity will not impose upon a litigant the necessity of attempting to perform acts the futilty of which is reasonably obvious from an examination of the circumstances.

Where the demand would have to be made upon those who are charged with having committed wrongs sought to be redressed and against whom the action would have to be brought and where a demand under the circumstances would be a vain thing it will be dispensed with.

**Koblitz v Brookside Brick Co., 20 O. C. (N.S.) 67.** See also Ross v Quinnesec Iron Min. Co. 142 O.C.A. 33, 227 Fed. 337; Santen v U. S. Shoe Co., 25 O.N.P. (NS) 363. Also **Wasmer v Massillon Iron & Steel Co., 7 Oh Ap 488,** and **Lowrey v Wefler, 12 Abs 34, 36 O.L.R. 322. Cooper v Central Alloy Steel Corporation, 43 Oh Ap 455; Roderick, Trus-**

tee, et al v The Canton Hog Ranch Co., et al, 46 Oh Ap 475.

An action like wise may be maintained by a stockholder without a previous demand when from ▉▉▉▉▉▉ all of the circumstances in the case it is made to appear with reasonable certainty that the directors cannot and will not bring the action and that therefore the making of the demand would be a futile act. The evidence regarding this question establishes that an action was instituted in the year of 1931 in which Dyson, et al, as stockholders in a representative capacity, brought suit against the alleged culpable directors praying for damages based on misconduct connected with the identical transactions now before this Court. The Dyson action was resisted and contested by those men who were directors of Republic Iron & Steel in 1931 and they approved the expenditure of a certain amount by the corporation to procure a dismissal of the action with the purpose of eliminating the unsavory publicty that was connected with the lawsuit. When the aforementioned expenditure was made the directors in procuring the advice of counsel pertaining to the merits of the claims made by Dyson were advised that the claims were unture and unsupported by fact.

When the instant case was filed on May 10, 1935, eleven of the then directors were also directors when the Dyson case was started while it was pending and when it was dismissed on October 19th, 1932.

Without entering into a discussion of the various circumstances tending to establish the attitude of the directors towards the action, the Court is of the opinion that the testimony on the whole preponderates in favor of the claim made by the plaintiffs, that a demand upon the directors would be futile.

To me it seems that if the directors of Republic of New Jersey on May 10, 1935, were at all in a sympathetic or impartial mood towards the bringing of the action they had ample time to either join with the plaintiffs' claim and prayer in the Dyson case or to separately bring the action in the name of Republic of New Jersey after it was dismissed by Dyson and his co-plaintiffs. Necessarily great weight must be attached to the act of the directors when on October 19, 1932, on the basis of their disbelief in the soundness and merits of the complaints made by Dyson they deemed it advisable to spend the sum of $9,558.81 to settle that action. Nothing in the testimony indicates that anything has happened to alter or that the directors changed the opinions implied by them in their treatment of the Dyson case. It is, therefore, my finding of fact that though an actual demand by the plaintiffs upon the Board of Directors to bring the instant action was not made, the testimony establishes that an actual demand would have been a futile and a senseless act, and therefore was unnecessary.

IN OHIO IS IT NECESSARY FOR THE PETITIONER IN A STOCKHOLDERS DERIVATIVE ACTION TO HAVE BEEN THE OWNER OF STOCK IN THE CORPORATION AT THE TIME THE ALLEGED WRONGS OCCURRED?

The testimony establishes that Mrs. Falkenstein was not a stockholder in Republic Iron & Steel Co. but acquired her shares of stock in the new R. F. N. J. in exchange for stock held by her in Central Alloy Steel Company, one of the merged companies. She acquired a third share on August 22, 1935, after the petition in the within suit was filed.

Mrs. Iva Jensen was also a stockholder in Central Alloy and acquired five of her nine shares likewise as a result of the merger. The other four shares she acquired as a dividend on stock held by her in the Canton Stamping & Enamelling Company.

The three intervening petitioners held stock in the original R. I. & S. and if they are otherwise proper and bona fide plaintiffs, they are not subject to challenge on the basis of the time when they acquired their stock holdings in R. I. & S.

Though I have held that the three intervening plaintiffs have the legal capacity to bring the stockholders representative suit and that they are free from bad faith, I shall, nevertheless, discuss the legal question raised regarding the capacity of Iva Jensen and Frances Falkenstein to continue as plaintiffs herein.

The defendants contend that the better rule dealing with the time when the plaintiff in a stockholders derivative action must have become the owner of stock is set forth in Hawes v Oakland, 103 U. S. 450 (1881). Therein it was held that in a stockholder representative suit the plaintiff must prove that he was such a stockholder at the time the wrong occurred.

The plaintiffs, however, urge for the Court's consideration the contrary rule, as announced in Politz v Gould, 202 N. Y. 11, 94 N.E. 1088 (1911) and which they claim was followed in Dissette v Publishing Co., 19 Cir. Dec. 168, and in Santen v Shoe Company, 25 N.P. (NS).

In determining which of the two rules ought to be applied profound weight must be attached to the relative soundness of the reasons supporting the adoption of the different rules.

To hold that the stockholder as a pre-requisite to the right to maintain the action must show that at the time of the commission of the wrong he was the owner of the stock would be to state impliedly that the wrong when perpetrated must there and then have operated as an injury upon a local or equitable right of the plaintiff.

Under such a rule the further implication would be that the subsequent stockholder suffers no injury through the refusal of the directors to conserve and harvest the corporate assets.

Obviously a person who owns stock in a corporation at the time a wrong is perpetrated suffers an indirect injury to the estate and interest that he has in the ultimate disposition of the corporate property.

But it is also irrefutable that a subsequent stockholder suffers a similar injury neither increased nor decreased by the time when he became the owner of the stock.

His right to participate as beneficiary in the corporate assets does not depend upon the time when he acquired the stock. His interest as a stockholder lies in the protection and acquisition of all corporate assets regardless of the time when the right or interest of the corporation accrued.

In Just v Idaho Canal & Improvement Co., 102 Pac. 381, (Supreme Court of Idaho, 1909) the court said, in syllabus 1:

"A stockholder suing on behalf of his corporation, which is unable or unwilling to bring suit, and pleading a good cause of action, may maintain the same, though he was not an owner of stock at the time the breach of duty was committed or the cause of action accrued, except in cases where it is shown that he purchased the stock with the purpose of bringing suit, or where his vendor was for some reason estopped from maintaining the action and the purchaser had notice of such bar."

In the same case on page 383, the Court stated:

"Mr. Marawetz, in his work on Private Corporations (section 265) speaking of this question, says: 'Causes of action belonging to the corporation increase the value of the corporate estate, and must be treated like any other assets; when enforced, they inure to the benefit of all the shareholders without distinction. It is plain therefore that a shareholder has an interest in all causes of action belonging to the corporation, whether they arose before or after he purchased his shares. If the courts decline to protect this interest in any particular case, their refusal must be based upon some principle of public policy, or the personal disqualification of the plaintiff.' And in §266 the author continues: 'There seems to be no good reason why a shareholder should not, as a rule, be permitted to sue on account of causes of action which arose before he purchased his shares; it being assumed, of course, that the corporation ought to sue, but is

unable to act. If purchasers were disqualified from protecting their interests under these circumstances, the transferable value of shares might be impaired, and the loss would fall upon the innocent holders who were wronged.' "

While the plaintiff in a stockholders representative action is ▮▮▮▮▮▮▮ nominally the complaining stockholder, the true parties to the action are the corporation and the persons against whose derelictions complaint is made.

Dealing with this subject the court in Beaudetti, et v Graham, 165 N.E. 671 (Supreme Judicial Court of Massachusetts, 1929) stated:

"When suit is brought by stockholder in representative capacity to vindicate rights of corporation or wrongs committed by corporate officers, it is the corporation alone whose interests are immediately concerned, and such wrongs have no relation to stockholder except as he has a derivative and indirect interest."

If it is true that the corporation is the true party to the action then what difference does it make in the protection of the corporation's rights whether the plaintiffs acquired their stock before or after the wrong was committed?

Moreover, if the stockholders, regardless of when they acquired their stock, are to benefit indirectly by the successful prosecution of the suit, why then isolate the right to bring the action only to those who were stockholders before the wrong was committed.

I am unable to perceive any reason for the Federal courts adopting the rule as announced in Hawes v Oakland other than the purpose to prevent the transfer of stock to non-residents to enable them to bring the action in Federal Court on the basis of diversity of citizenship. Inasmuch as the rule in the Federal courts is predicated upon

a special reason, it ought not to be followed in State courts where that special reason does not exist.

While no sound reason appears in State courts for distinguishing, on the basis of the time when the stock was acquired, the right of a stockholder to maintain a derivative action, on the contrary, the identical and distinctive characteristics of the respective rights seem to me to constitute a sound reason for placing their rights on a parity.

In the case before the bar it further appears that the plaintiffs, Mrs. Falkenstein and Mrs. Jensen, were owners of stock in Central Alloy and when that company was merged into the Republic Steel Corporation they received stock in the new company for that owned in Central Alloy. Thus on January 15, 1930, while they were not stockholders in Republic Iron & Steel, they were in Central Alloy. These companies together with Bourne and Fuller and Donner Steel were merged into the Republic Steel Corporation on April 8, 1930.

In Meredith v Art Metal Construction Co. et, 161 N.Y. Sup. 1, and in Arnstein v Bethlehem Steel Corporation, et, 18 Fed. Sup. 916, (District Court of New York) it was held:

"That the right of action of a corporation for neglect of directors does not cease on merger or consolidation but that the corporation which has acquired all of the rights and properties of the constituent companies is entitled to bring suit, and that the stockholders of such consolidated corporation may sue on behalf of all stockholders when such consolidated corporation refuses to bring suit."

In my opinion, the original plaintiffs, Mrs. Falkenstein and Mrs. Jensen, did have the legal capacity to bring the within stockholders rep- ▮▮▮▮▮▮▮ resentative suit on behalf of Republic of New Jersey either as stockholders who subsequent to the wrong, in good faith acquired their interest, or as former stockholders in one of the merged companies.

### GOOD FAITH.

UNDER THE FACTS ESTABLISHED BY THE TESTIMONY, ARE THE PLAINTIFFS VESTED WITH THE RIGHTS TO MAINTAIN THIS ACTION IN EQUITY?

The plaintiffs claim that the action is brought in good faith for the benefit of the Republic Steel of New Jersey. On the other hand, the defendants assert that the testimony establishes that the plaintiffs have not come in to equity with clean hands, and that the purpose of the action is not to benefit Republic of New Jersey, but solely to aid a Mr. Falkenstein and a Mr. White, accountants who examined the books of the corporation. The proof establishes that the original action was instituted by Frances Wheale of Warren, Ohio, Frances Falkenstein of Bottoneau, N. D., and Iva Jensen of Cleveland Heights, Ohio.

The verification to the original petition was sworn to by Mortimer C. White, as agent and attorney-in-fact for Francis H. Wheale by Edward J. Falkenstein, an agent and attorney-in-fact for Frances Falkenstein and by Iva Jensen, personally. Although some testimony was offered to the effect that Francis H. Wheale never authorized Mortimer C. White to verify or file the petition as attorney-in-fact, I shall not further discuss the situation relative to Mr. Wheale for he is no longer a party to this action.

The second plaintiff in the original action was Frances Faulkenstein. She is the owner of three shares and is the mother of one of the accountants, associated with Mr. White, in the examination of the books of the various companies hereinbefore discussed.

The other plaintiff in the action, Iva Jensen, is the owner of 12 shares of common stock and when called upon during the trial to appear for cross-examination, she by letter, informed the Court that she was out of the State and that she would prefer to withdraw from the case rather than to respond to the order. Thus, at the commencement of the trial the plaintiffs to the action were Mrs. Jensen, owning 12 shares, and Mrs. Faulkenstein, owning 3 shares of stock in the defendant corporation. While the trial was in progress on motion the Court granted leave to Flora Haas of New York City, N. Y., and Wallace I. Keep, of Rockport, N. Y., and Leonard Blum of Cleveland Ohio, to become intervening plaintiffs. Flora Haas is the record owner of 220 shares, Wallace I. Keep of 310 shares and Leonard Blum of 70 shares of the common stock of the six million shares issued by The Republic Steel Corporation. We thus have before the Court at the present time, as plaintiffs, Iva Jensen and Frances Faulkenstein, the original petitioners who own 15 shares of the Republic Steel Corporation common stock, and the intervening petitioners who own 600 shares, making a total of 615 shares owned by the present plaintiffs, out of six million shares of the outstanding stock of the defendant corporation. Neither Wallace I. Keep of Rockport, N. Y., nor Flora Haas of New York City, N. Y., appeared in Court. The pleadings filed by them were verified by counsel of the original plaintiffs.

The proof further establishes that the accountants, Mortimer C. White and Francis Faulkenstein, during the year of 1932, had legal access to the books, records and the minutes of the meetings of the Executive Committee of the Board of Directors of The Republic of New Jersey and Republic of Delaware; that at or about that time there was instituted in the Common Pleas Court of this county, an action, styled Dyson v Republic of New Jersey, et, involving practically the same claims as are presented by the case now before the Court. This action was dismissed when Republic of New Jersey agreed to pay court costs, accounting expenses, and the reasonable value of the work done in connection with the suit, in all amounting to $9,558.81. Mortimer C. White in the within action testified that at the time the case of Dyson, et v Republic Steel Corporation et was filed he was also engaged as an accountant in the prosecution of a stockholders suit against the Cleveland Cliffs Furnace Company. The Cleve-

land Cliffs Furnace Company action in which he was interested was decided by the trial court in favor of the defendant directors and subsequently a settlement was made while the action was pending in the Court of Appeals. Mr. Wilkin was counsel for the plaintiffs in the Dyson case and in the Cleveland Cliffs Furnace case and subsequent to the settlement of those actions he paid to Mortimer C. White $2500.00 for accounting services rendered in the Cleveland Cliffs Furnace but not in the Dyson case.

Practically three and one-half years elapsed between the dismissal of the Dyson action in 1932 and the institution of the action before the Bar on May 10, 1935. Mortimer C. White testified that his services were only to be compensated in the event the suit was successfully maintained by the plaintiffs.

Leonard Blum, one of the intervening petitioners, appeared in court as a witness. His testimony establishes that he learned of the action from the accounts of the trial reported in the newspapers and from Mr. Schwenger, one of the plaintiffs' counsel. It appears that Schwenger and Mr. Blum by coincidence met one morning while on the way to their offices. After a brief discussion Mr. Blum asked Mr. Schwenger to be allowed to enter the action as a party plaintiff. It further appears that Mr. Blum had no knowledge of the gravamen of the complaint but obtained all of the information upon which he predicated his right to intervene primarily from Mr. Schwenger. It is obvious to the Court that the entrance into the action of the intervening petitioners was intended solely to cure whatever deficiencies might have previously existed in the rights of Frances Faulkenstein and Iva Jensen to maintain the action.

But even though that is the fact it does not establish bad faith. On the contrary, they would be guilty of a moral wrong to the corporation if they failed to intervene at a time when they knew that unless they did so a probable right of the corporation would be sacrificed.

The defendants argue that the small holdings of the present plaintiffs cast a suspicion upon the bona fides of the claims made by them.

They cite Danmeyer v Coleman, 11 Fed. 97 (C. C. Calif. 1882) in which the Court said:

"It is always a suspicious circumstance where a single stockholder among the large number in a corporation, rushes into a court to vindicate unaided and alone the rights of the corporation and all other stockholders; and especially is this so where the amount of stock owned by him is so very limited that in case of success his own share of recovery would be so small as to make the maximum 'de minimis non curat lex' very properly applicable."

They further rely upon **Cooper v Central Alloy Steel Corporation, 43 Oh Ap., 455 (1931)**; Heinz v National Bank of Commerce, 237 F. 942, (C.C.A. 8th, 1916); Home Fire Insurance Company v Barber, 67 Neb. 644, 93 N.W., 1024, (1903); Greenough v Alabama, G.S.R. Co., F. 22, (C.A. Ala., 1894).

While Danmeyer v Coleman, supra, holds that in stockholders derivative actions the small holdings of the complaining stockholder warrants suspecting the bona fides of his complaint, yet it does not hold that that fact alone establishes the bad faith of the stockholder.

Manifestly, if the smallness of the plaintiffs' holdings alone establishes inequitable conduct in bringing the action then such a stockholder though sincere, candid and acting in good conscience would always be debarred from maintaining such a suit.

A New York court dealing with a similar situation cogently expressed itself as follows: Dresdener et v Goldman Sachs Trading Corp. et, 259 N. Y. Sup. 360.

"However, stockholders in large corporations are, as a matter of common knowledge, generally uninformed, and in a measure indifferent conconcerning the management of the corporation. Generally, without inquiry, they sign

proxies as a matter of course so that directors and officers may be re-elected and their policies may be continued. When dividends cease and the stock becomes comparatively worthless, they may complain and grumble, but rarely will they resort to the courts for a remedy. The reason for such inertia is readily found. Stockholders are widely scattered and have no definite method of contact with each other. * * * So, unless a group is organized by ambitious counsel, or one or more stockholders have great courage and ample means to maintain a long continued litigation, the stockholders remain quiescent, accepting their misfortunes as a decree of relentless fate."

Reference is made by the defendants to **Weinberg v Republic Steel Corporation,** Cuyahoga Court of Appeals, No. 16, 417, **(27 Abs 543)** in which the court held that it was the duty of a trial court to dismiss an action by a stockholder who in the management of the suit was controlled by a labor organization conducting the strike against the corporation.

Likewise, a stockholder who is a puppet or instrumentality of a rival company or scheme and brings the stockholder's derivative action to aid the rival company is guilty of such inequity as will debar him from obtaining equitable relief.

Forrest v Manchester Railway Co., 4 D. G. H. J. 126; **Weinberg v Republic Steel Corporation,** supra; Kuhn v Woolson Spice Co., 70 C. D. 289 (1897); **Mortgage Co. v Rosenblum, 114 Oh St 231.**

In Forrest v Manchester R. R. Co., supra, the Court said at page 130:

"* * * It has been a very wholesome doctrine of this court that one shareholder having in view the legitimate purposes of the company may be permitted in this court to maintain a suit on behalf of himself and the other shareholders of the company, but the principle upon which that constructive representation of the shareholders is permitted undisputably requires that the suit shall be a bona fide one, faith-

fully, truthfully, sincerely directed to the benefit and the interests of those shareholders whom the plaintiff claims a right to represent."

But the established facts in the case before the bar do not bring it within the purview of the rulings to the Weinberg case and similar cases above mentioned.

While the relationship of Mrs. Faulkenstein to one of the accountants in the action might cause a suspicion that she was induced by her son to institute the suit there is no testimony of a substantive character establishing the truth of the suspicion. The accountants, and counsel have been zealous and painstaking in the preparation and presentation of the plaintiffs' case with its multiple ramifications. Their compensation depends upon their successful termination of the plaintiffs' suit. Because the accountants and counsel for plaintiffs have been willing to render their services, the compensation for which is dependent upon the contingency that the suit will be determined in favor of the plaintiffs, it is claimed by the defendants that that fact is a circumstance, establishing bad faith. If such a conclusion is sound then in a suit of the character before the bar requiring protracted service of accountants and counsel, a stockholder or a small group of stockholders, regardless of the genuineness of their complaint and the flagrancy of the directors' delinquencies, would evermore be barred from equity because of the zeal of their accountants and counsel working upon a contingent fee would stand as an obstacle in their path of obtaining redress for themselves and the corporation. Thus the paradoxical situation would exist that without counsel and accountants the suit because of the magnitude of the expense could not be maintained, while with counsel and accountants working upon a contingent fee the plaintiff would ipso facto be charged with bad faith, with being a puppet and thus closing the doors of equity against him.

The rule is well established that no one can seek affirmative relief in a

court of equity with reference to a transaction in connection with which he has, himself, been guilty of inequitable conduct. **Kahn v Wallin, 46 Oh St 195; Mortgage v Rosenblum, 114 Oh St 231; Kinsman National Bank v Jerko, 111 Oh St 633.**

Thus, a stockholder who sues in his representative capacity as a prerequisite to the right of obtaining affirmative relief must appear before the Court free from inequity and with clean hands.

The general rules of law on the subject are well settled. In the final analysis it becomes a question of fact in this case for the Court to determine whether the action of the plaintiffs is prosecuted in good faith and free from inequity.

Mrs. Iva Jensen, the plaintiff who failed to appear for cross-examination, was out of the State. No subpoena was issued for her; nor were her depositions taken. Though she is charged with bad faith and with being a puppet of the accountants and impliedly of counsel, the truth of that charge is not established by the evidence. On the whole the honesty of purpose of all the plaintiffs has been suspicioned but not established by the testimony before the Court.

The defendants respecting their claim that the plaintiffs are guilty of bad faith in bringing the action are in practically the identical position occupied by the plaintiffs with respect to the latter's claim that the defendants made secret profit, bailed out codirectors, and were guilty of fraud.

These respective claims, vehemently and eloquently argued by counsel are founded in suspicions and not in substance.

It is my finding of fact that the plaintiffs are not guilty of bad faith or inequity in the prosecution of the within suit.

To find otherwise would require the Court to reach outside of the testimony and the reasonable inferences to be drawn therefrom and to ground its finding upon speculative and conjectural facts that might or might not exist.

WAS THE ACTION BROUGHT WITHIN THE TIME PRESCRIBED BY THE STATUTE OF LIMITATIONS APPLICABLE TO THE PLAINTIFFS' COMPLAINT?

The answer to this question depends upon the determination that is made respecting the identity of the statute of limitations that controls the time within which the plaintiffs' action had to be commenced.

Plaintiffs aver that §11224 GC is controlling.

The statutes upon which the plaintiffs and defendants respectively rely are as follows:

"Sec. 11227. An action for relief not hereinbefore provided for, shall be brought within ten years after the cause thereof accrued. This section does not apply to an action on a judgment in another state or territory."

"Sec. 11224. An action for either of the following causes, shall be brought within four years after the cause thereof accrued:

1. For trespassing on real property;
2. For the recovery of personal property, or for taking or detaining it; 3. For relief on the ground of fraud; 4. For an injury to the rights of the plaintiff not arising on contract nor hereinafter enumerated.

If the action be for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it be for fraud, until the fraud is discovered. (112 v 237; R. S. 4982. Eff. Aug. 2, 1927)".

Plaintiffs claim that the working of the various statutes limiting the time within which actions can be commenced considered in connection with §11227 indicates that the legislature intended that all actions, excepting complaints for fraud brought in equity are governed by the ten year statute. They

claim that even though an action is maintainable in law, if the remedy in law is not utilized because of its inadequacy to give the desired relief and if consequently the action is brought and maintainable in equity, the ten year statute controls notwithstanding that had the action been brought in law a different period of limitation would have applied. Secondly, they claim that even though §11227 does not apply to all actions brought in equity, it does apply to the action before the bar because the action is predicated upon a right recognized exclusively in equity.

On the other hand, the defendants contend that when an action is brought in equity to obtain a remedy ordinarily granted by a court of law and the action is cognizable in equity only because of the inadequacy or the total absence of a remedy at law that in such cases equity will apply that statute of limitations applicable to the action had it been brought in law instead of equity.

Plaintiffs urge that the language "action for relief" found in §11227, must be construed to mean **"equitable action"** while that found in the other section of the statutes to mean **"legal actions"**. The statutes do not contain the words "equitable or legal" and the interpolation of those modifiers can only be made on the theory that the legislature when it used the word "relief" in §11227 proposed to embrace all actions brought in equity within the provisions of that statute, and all actions brought in law within the purview of the sections other than §11227.

Plaintiffs point out that in the other sections under the chapter dealing with the time when suits must be brought the legislature uniformly provided that "an action to recover real property * * *" (§11219), that "an action upon a specialty or agreement * * * " (11221), that "an action upon a contract not in writing * * *" (11222), that "an action for bodily injuries * * *" (11224-1), that "an action for libel, slander * * *"

(11225) that "an action on the official bond * * *" (11226), must be brought within the time limit prescribed by the different statutes.

Plaintiffs argue that when the legislature in §11227, said that "an action for relief, etc." it had specifically in mind equitable actions because the word "relief" is only used in connection with equitable remedies; and that in the other sections heretofore mentioned the legislature when it stated that "an action for recovery of real property * * *", designedly omitted the word "relief" because it had in mind only actions brought in law.

An examination of the chapter dealing with the Statute of Limitations in Ohio discloses that primarily the legislature dealt with (a) actions for recovery of real and personal property; (b) actions upon contracts; (c) actions in tort, and (d) actions upon statutory penalties and forfeitures.

When it finished its provisions covering these four principal divisions it then realized that some actions not within any of the previous provisions might arise and that therefore one section dealing with miscellaneous actions had to be written.

Therefore §11227 was written with the intention of providing a period of time within which all actions not coming within the purview of any of the preceding specific statute of limitations had to be brought and that section was intended to deal not with actions brought either in law or equity for the recovery of real or personal property, actions arising out of a tort or contract or statutory penalty but with rights created solely by the principles of equity.

While §11227 does apply only to actions brought in equity, it does not apply to all actions brought therein.

As already pointed out, the legislature in each of the statutes, except §11227, used the language "an action * * * shall be brought * * *". It did not say that a "legal action" or an "equitable action" under certain conditions had to be brought within a specified time. On the contrary, it conspicuously omitted the modifiers "equitable" and

"legal", manifestly intending that regardless of the equitable or legal nature of the "action" if it was grounded upon any of the rights or wrongs mentioned in the statutes it had to be brought within the time stipulated in the particular statute.

The omission of the language, "legal actions", or "all actions brought in law," in view of the simplicity and ease with which it could have been inserted warrants the conclusion that the legislature did not intend that the sections other than §11227 were intended to apply only to actions brought in law.

Furthermore, in attempting to construe what types of action the legislature meant when it rather uniformly in each of the statutes said "an action * * * shall be brought", we must not overlook the language of the very first statute in the chapter on "Limitation of Actions."

Sec. 11218 GC. Lapse of time a bar. A civil action, unless a different limitation is prescribed by statute, can be commenced only within the period prescribed in this chapter. When interposed by proper plea by a party to an action mentioned in this chapter, lapse of time shall be a bar thereto as herein provided. (R. S. par. 4976, 4979; 29 Oh St 245; 30 Oh St 184)."

In addition to the provisions of §11-218, we find that §11237 specifically defines the word "Action."

"Sec. 11237 GC. Action defined. An action is an ordinary proceeding in a court of justice, involving process, pleadings, an ending in a judgment or decree, by which a party prosecutes another for the redress of a legal wrong, enforcement of a legal right, or the punishment of a public offense. (56 Oh St 407)."

This action certainly does not indicate an intent of the legislature to give the word "action" the narrow interpretation ascribed to it by plaintiffs.

An examination of the statutes dealing with procedure, and especially discussing the subjects, "Parties to Action", and "Where action is to be brought", and "Commencement of Action," found in §11241 to 11305, both inclusive, very definitely establish that throughout all of the procedural laws whenever the legislature spoke of "actions", it did not intend any restriction upon the term but had in mind legal and equitable actions alike.

The confusion and irregularity of rights and obligations that would flow from the construction that the plaintiffs are urging upon the court is astounding and manifest when their construction is applied to hypothetical cases.

If the rule urged upon the Court by the plaintiffs were accepted, it is interesting to observe what the consequences of its application would be in Ohio.

Sec. 11222 GC provides that:

"An action upon a contract not in writing, express or implied, * * * shall be brought within six years after the cause thereof accrued."

It is a recognized rule that a court of equity will enforce the specific performance of a contract to sell unique chattels. Many cases in equity have held that chattels which cannot be duplicated, such as works of art, will be ordered transferred by a court of equity in an action to specifically enforce the contract.

Adderley v Dixon, 57 Eng. Rep. 239; Scarbourough v Scotten, 69 Maryland, 137.

It is thus obvious that an action for damages on a contract not in writing, involving the sale of chattels, would have to be brought within six years from the time the action accrued and if not instituted within that period would be barred.

Following the six, and before the expiration of the ten, year period, if the claim of the plaintiff is correct, he could proceed in equity to compel the specific performance of the contract. Thus the inconsistent situation would arise that in equity the action could be successfully prosecuted while in law

it would be barred because the statutory time had run.

Sec. 11224 in substance, among other things, provides that:

"An action * * * for the recovery of personal property or for taking or detaining it shall be brought within four years after the cause thereof accrued. * * *"

The General Code of Ohio governs the manner and the circumstances under which action in replevin may be brought to recover goods or chattels which are unlawfully withheld by a wrongdoer. Under the Code, however, when an action in replevin is brought, the defendant may have released to him the chattels upon the posting of a redelivery bond. Under the terms of the bond, in the event the chattels are not available when the writ of replevin is granted, the plaintiff is relegated to his action upon the bond. He is thus deprived of the chattels · even though they are of a unique character, cannot be substituted, or possess a sentimental value to the plaintiffs.

Chattels of a unique character because of the inadequacy of the remedy at law can be recovered in equity by a mandatory injunction.

Duke v Somerset v Cooks on 24 Eng. Rep. 1144; Pusey v Pusey, 1 Vern 273; McGowin v Remington, 12 Pa. 56; Burr v Bloomsburg, 101 N. J. 615.

Again we have the irreconcilable conflict that in cases involving unique chattels though the right of replevin is outlawed by the provisions of §11224 GC, the plaintiff could proceed in equity and obtain a mandatory injunction, accomplishing in equity a recovery of the chattels which remedy in law was unavailable because the statutory time available because the statutory time for the bringing of the action had passed.

What have been the rulings in Ohio dealing with the universality with which §11227 must be applied to actions brought in equity?

Sec. 11221 GC provides that:

"An action upon a speciality, or an agreement, contract or promise in writing, shall be brought within fifteen years after the cause thereof accrued."

In **Kerr v Lydecker, 51 Oh St 240,** the Court held that an action to foreclose a mortgagor's equity of redemption was governed by the fifteen year (§11221) statute of limitations. This case in my opinion demonstrates that all actions brought in equity are not from the standpoint of the statute of limitations controlled by §11227. In the action wherein the mortgagor's equity of redemption is sought to be foreclosed, the subject matter of the lawsuit is definitely of an equitable character. The equity of redemption is not recognized in law but exclusively and solely, in equity. The remedy for which petition is made is likewise purely of an equitable character. The prayer is not for the recovery of a money judgment, or of real or personal property, but for the permanent severance of the mortgagor's equitable interest in the property by a sale thereof.

Though the authors on equity differ widely respecting the jurisdictional classification of equitable actions a unanimity of opinion exists placing foreclosure proceedings in the exclusive jurisdiction of equity.

On the basis of plaintiff's claim that every action (either within the exclusive or concurrent jurisdiction,) brought in equity is controlled by the ten year statute it would seem to follow that a foreclosure proceeding ought to be similarly controlled by §11227.

The weight of authority on the subject holds that when the jurisdiction of equity over an action is exclusive either the doctrine of laches or the statute dealing with miscellaneous relief applies. Had the Court in Kerr v Lydecker followed the theory of the plaintiffs' in this action, the ten year period prescribed by §11227 would have applied. Why did the Court in that case reach the judgment that §11221 was applicable? The defendants therein urged the applicability of the fifteen year period (§11221). It seems to me that the Court's decision can be re-

conciled only by the acceptance by the Court of the theory that subsequent to the adoption of statutes of limitations though an action is brought in equity it nevertheless is controlled by that statute of limitations which is applicable to similar actions at law. In the foreclosure proceeding the claim of the plaintiff predicated upon a written contract having the character of a speciality and was therefore controlled by §11221. If the actions were brought in law upon a speciality praying for legal relief the same section would govern.

Let us also examine the preposterous situation that would present itself in suits for contribution. The Court in Neilson v Fry, 160 S. 552, held that a suit for contribution is primarily an action for money only and that, therefore, the six year period (§11222) controls. When there are only two persons between whom the contribution must be enforced the matter is simple, because in the suit between them a judgment is rendered equal to a moiety of the amount paid.

But where the parties among whom contribution is sought are numerous, many difficulties might arise if the action is prosecuted in law. In such a situation each of the common obligors is liable to contribute only for his own aliquot portion. Consequently separate actions and verdicts must be filed and rendered. The defendants cannot be joined because a joint and several judgment cannot be rendered. If such a judgment were rendered the consequence might be the imposition of a greater share of the debt upon one common obligor than that borne by the plaintiff seeking contribution. Thus, in law, the plaintiff would be subjected to a multiplicity of suits without any assurance and security that the judgments rendered would result in an equitable allocation among the solvent debtors of the common debt.

Obviously where some of the obligors are solvent and others insolvent the rigid procedural limitations at law cannot be adapted to adjust the common debt on principles of equity.

Hence to avoid a multiplicity of suits and to procure in one proceeding a complete adjustment of the common debt the action can be maintained in equity. See **Heil v Conts, 25 Oh St 476.**

If the proposition is correct that a court of equity in certain cases for contribution still has jurisdiction, and if the contention of the plaintiffs is correct, that in cases filed in equity, the ten year statute applies is correct, then the hopelessly irreconcilable situation arises that whenever there are two joint obligors the right of contribution is barred in six years, but when the defendants are multiple in number, some of whom are insolvent, and, therefore, the action is brought in equity, the ten year period controls.

Neither logic nor justice commands the acceptance of such an irregular rule of law fraught with such inconsistencies.

In Neilson v Fry, supra, though the action for contribution was filed in equity the Court held that the six, and not the ten, year statute controlled.

Judge Welch in that case made the very appropriate comment:

"It would seem absurb to say that the limitation should be made to depend upon the form of the prayer in such cases * * *."

"Unless we regard the form and disregard the substance, the limitation in both cases should be the same, and so, to admit, is to admit that it should be six years in both cases."

The case of **Yearly v Long, 40 Oh St 27,** likewise establishes error in the plaintiffs' claim that all actions brought in equity are controlled by the ten year statute.

In that case a testator devised to his son all his real estate, attached with the burden that the son pay to the testator's daughter a legacy in annual installments was barred after the lapse legacy was an equitable charge upon the estate devised and that an action by the daughter to recover the unpaid

66

installments was barred after the lapse of six years from the time the right of action accrued on such installments respectively.

The action was initially brought by creditors to have liens adjusted and marshalled. The daughter, the legatee in the will, was made a party defendant. She filed an answer and cross-petition and claimed an equitable lien against the land by virtue of the legacy. Note must be taken that in this case though the Court recognized the legacy as an equitable charge against the land, it nevertheless, held that the ac-action was barred in six years. Her cross-petition in this case prayed for neither a money judgment, nor the recovery of specific real or personal property, but for purely equitable relief. The Court held that the action nevertheless was barred by the six year and not the ten year statute of limitations.

Under Pomeroy's classification of equitable suits aforementioned, this action must be included in the exclusive jurisdiction of equity. The right sought to be protected was recognized solely by equity. The relief for which prayer was made likewise was purely equitable and nothwithstanding these potent factors the Court held that when in six years the action for the debt was outlawed, even though the subsequent action was for relief in equity, the six year statute applied.

The Court held that the equitable charge practically was equivalent to a vendor's lien, and that under Borst v Corey, 15 N. Y. 505, and Clyde v Simpson, 4 Oh St 462, an action for the purchase money of land is barred by the six year statute after the debt accrued.

The Court said, on page 34:

"By the Code of Civil Procedure, the distinction between actions at law and suits in equity was abolished, and for all such judicial proceedings the civil action is a substitute. Formerly in this State statutes of limitation embraced only remedies at common law, and not those cognizable in equity. But, now, the lapse of time sufficient to bar the remedy, whether of a legal or equitable character, must be determined by reference to the statutory mandate."

The case of **Russell v Fourth National Bank, 102 Oh St 248 (1921)** likewise definitely disproves the claim of the plaintiff that in Ohio all actions for equitable relief are controlled by the ten year statute.

In that case an action was brought in equity by an administrator in December, 1912, against the defendant bank seeking to compel it "to transfer to the name of the administrator thirty shares of its stock, which had stood in the name of his decedent in 1865; or, in lieu thereof, to account to the administrator for the value of the stock, to be ascertained upon an accounting prayed for." He also prayed that "an accounting be had of dividends declared from time to time on the stock and for judgment for such amounts."

Directing our attention only to that phase of the plaintiff's prayer wherein he sought an accounting for dividends declared from time to time on the stock of his intestate, it is obvious that an action on the implied promise to pay to the stockholder the dividend could have been instituted in law and if it had the six year statute undoubtedly would have applied.

But the action was filed in equity for relief in the form of accounting and the Court in declaring the cause of action outlawed stated in the syllabus:

"Equity demands that rights should be asserted before lapse of time has made a judicial inquiry difficult and uncertain by reason of the death of parties, the loss of papers and books, the death of witnesses, and the intervention of equities and where delay, under such circumstances, exceeds the time fixed for suit by statutes of limitations, in an analogous action at law, the burden is on the party asserting such right to explain the delay and to show that it would be inequitable and unjust to refuse the aid of the court in the enforcement of the right."

It seems to me that no other conclusion can be drawn from that sylla-

bus than that the Court did apply the statute of limitations applicable to analogous actions at law.

In view of the irregularity of the rights and obligations that would result from the application of the rule urged by the plaintiffs and in view of the absence of supporting authority, it is my finding of law that §11227 GC does not apply to all actions brought in equity.

We now come to the plaintiffs' alternative claim that even though §11227 is held not to apply to all actions brought in equity that then the nature of the plaintiffs' right and remedy bring their claim within the exclusive jurisdiction of equity and therefore subject to the ten, and not to the six, year statute.

Originally courts of chancery in the exercise of their judicial discretion denied relief whenever the plaintiff or a defendant seeking affirmative relief had unreasonably delayed the commencement of his action until such time when the reason of changes in the circumstances for the granting of the relief would be unconscionably prejudicial to the rights of the adverse party.

Whoever came into equity praying for affirmative relief had to do so with reasonable promptness and vigilance, and without protracted delay during which witnesses had died, evidence became lost, the prices of the subject matter had changed and circumstances had otherwise become altered.

When legislatures began adopting statutes specifically designating the time within which particular actions had to be brought, a new problem was presented to the Chancellors. Were they in equity to adopt the time prescribed by statutes of limitations or to continue exercising their judicial discretion denying the relief not upon the sole consideration of the quantum of time that had passed but upon the doctrine of laches considering primarily whether the unreasonable delay caused such changes in the circumstances of the transaction that the allowance of the relief would operate inequitably and prejudicially upon the unsuccessful party.

In the treatment of this new question some of the Chancellors in actions only where courts of equity and courts of law had concurrent jurisdiction obeyed the statutory provisions and denied relief even though no prejudice had resulted to the defendants as a result of the delay. In particular these courts in actions of concurrent jurisdiction acted in obedience to the statute.

Other chancery courts in actions of concurrent equitable and legal cognizance generally in the exercise of their judicial discretion denied relief whenever a period of time had expired equal to or more than that designated in statutes of limitations applicable to analogous actions at law.

In contrast, the decisions rather uniformly held that in those actions where equity had exclusive jurisdiction and the chancellor neither by obedience nor analogy followed the statutes of limitations but allowed or disallowed relief solely on the absence or presence of laches.

The earliest discussion dealing with whether courts of equity were to be controlled in their adjudications by statutes of limitations is found in Kane v Bloodgood, 20 C. H. N. Y. (1883) wherein Chancellor Kent said:

"Courts of equity are bound to yield obedience to the Statute of Limitations upon all legal titles and legal demands, and cannot act contrary to the spirit of its provisions. I understand this proposition to mean that, if the party has a legal title, and a legal right of action, and instead of proceeding at law, resorts to equity,—instead of bringing his action of account, or detinue, or case for money had and received at law, files his bill for an account,—the same period of time that would bar him at law will bar him in equity. This is the principle that pervades the case."

The rule as defined by Kane v Bloodgood within five years thereafter was translated into statutory form by the legislature of New York.

2 R. S. No. 111, Ch. IV.

"Sec. 49. Whenever there is a concurrent jurisdiction in the courts of equity, of any cause of action, the provisions of this Title limiting a time for the commencement of a suit for such cause of action, in a court of common law, shall apply to all suits hereinafter to be brought for the same cause, in the court of chancery."

"Sec. 50. But the last sections shall not extend to suits over the **subject-matter** of which, a court of equity has **peculiar and exclusive** jurisdiction, and which subject matter is not cognizable in the courts of common law."

Thus the courts of equity in New York after the enactment of statutes of limitations and before the adoption of the code consolidating and unifying the procedure into a single system held that actions of concurrent jurisdiction brought in equity were to be governed by the period of limitations applicable to the suit had it been brought in law.

What was the situation in Ohio prior to 1853 when the rules of procedure were reformed and simplified by the fusion of law and equity?

Prior to the adoption of the code of civic procedure, the decisions of Ohio clearly indicate that the courts of equity applied to actions brought in equity the identical statutes which would have governed had the action been brought at law.

In **Horton v Horner, 14 Ohio 437,** (1846) an action was brought in equity by an assignee to collect the purchase money due under a contract wherein land was sold, and to enforce the lien of the vendor for the unpaid purchase price. The debt and the vendor's lien originally belonged to the plaintiff's assignor. He, however, assigned all his rights therein to the plaintiff who subsequently brought suit. According to the opinion of the court the action was brought in chancery because (A) an assignee of a chose in action could not sue in his own name in law and (B) because the assignee was attempting to enforce an equitable vendor's lien for the unpaid purchase price.

The jurisdiction based upon the enforcement of an equitable right collapsed because the court had previously, in **Jackman v Hallock, 1 Ohio 318,** held that a vendor's lien could not be assigned so as to vest the right to enforce it in the assignee.

In considering this case we must remember that originally the jurisdiction of equity over suits brought by the assignees of choses in action was recognized because an assignee of a chose in action could not sue in law.

Under the common law assignments of things in action expectancies and possibilities were not recognized. Courts of chancery from an early date declared this technical rule to be too narrow and practically absurd. Equity, acting upon the conscience of the debtor or obligor, treated the assignment as a transfer of the equitable interest in the chose in action and permitted the assignee to sue in equity to obtain redress. Thus under the common law originally the assignee did not, while in equity he did, have a remedy. After courts of equity recognized such assignments, the common law rule was modified allowing the assignee to sue in law in the name of the assignor.

In this case of Horton v Horner, supra, based upon the remedy created by equity the assignee sued in that court to obtain a money judgment. The defendant pleaded the six year statute of limitations covering actions on oral contracts.

On page 443, Judge Hitchcock, in the opinion, said:

"Courts of chancery regard such statutes as much as courts of law; for if they do not, still a claim which would be barred at law, must, if prosecuted in chancery, be governed by the same rule. The bare circumstances that it is prosecuted in chancery, cannot take it out of the statute. Now there can be no doubt but that this claim might have been prosecuted at law. What

is it? Merely a demand for the purchase money for land sold. A proper subject for the jurisdiction of a court of law, and of which a court of chancery cannot take jurisdiction, unless it is upon the ground that the complainant is the assignee of a chose in action, which is not negotiable. Perhaps, however, it may be thought that a court of equity might take the jurisdiction on the ground that one object of the bill is to enforce the vendor's lien. According to our views of the law, and according to the decisions of this court, this lien cannot be transferred by the act of the vendor, so as to vest the right to enforce it in his assignee. It was so held in the case of Jackman v Hallock, 1 Ohio 318, and has been so held at the present time.

"The complainant, then, might have had his action at law in the name of his assignor, for his use. This would have been his appropriate remedy. But in such case, the statute of limitations might have been pleaded in bar. By commencing his suit in chancery, he can gain no advantage in this respect. If his demand is barred at law, it must be in chancery."

Again in the case of Tuttle v Wilson, 10 Ohio 24 (1840) a widow brought suit to recover possession of land under claim of dower in the lands of her deceased husband. The action was commenced in equity more than twenty-one years after her husband's death.

An act of limitations was adopted by the legislature in 1810 providing:

"That no person or persons shall hereafter sue, have, or maintain any writ of ejectment, or other action, for the recovery of the possession, title, or claim, of, to, or for any land, tenements, or other hereditaments, but within twenty-one years, next after the right of such action or suits shall have accrued, etc."

It will be seen that it is not only an action of ejectment which is barred by this statute, but every other action for the recovery of the possession, title, or claim to any land.

In declaring her right to dower outlawed both by force of the statute of limitations and the doctrine of laches the court said:

"It is, however, a general rule, both in England and the United States, that statutes of limitations do not, ex vi termini, extend to suits in chancery, yet courts of equity in both countries constantly admit their obligation, and act not only in analogy, but in obedience to their provisions. It is, indeed, well settled, that a statute of limitations will not be applied, in equity, where it would bar the claim at law. 1 Story's Eq. 502; 2 Story's Eq. 735; 6 Peters 66."

In **Ridley v Hettman, 10 Ohio, 524 (1841)** the court said:

"Equity ordinarily acts in analogy to the law in giving effect to statutes of limitations."

See also **Peter and Mary Larrowe v William Beam, 10 Ohio 498 (1841).**

The decisions prior to the fusion of law and equity in Ohio are devoid of any distinction being made between actions of exclusive and concurrent jurisdiction and to the effect that courts of equity acting in analogy apply the statute of limitations applicable to analogous actions at law.

So we come down to the period beginning in 1848 when the State of New York, followed by Ohio in 1853, and thereafter by many other states, adopted legislation fusing the procedure rules governing actions in equity and law into a single unified system.

With the merger of law and equity into a single remedial system the statutes of limitations were rewritten to conform with the changed conditions.

Though the statutes of limitations were rewritten, the decisions in New York subsequent thereto establish that the rule respecting actions in equity in that state was not changed nor intended to be changed and that where there is a legal and an equitable remedy in respect to the same subject matter, the action in equity is governed by the

same period of limitations as the action in law.

See Rundle v Allison, 34 N. Y. 180 (1866); Butler v Johnson, 111 N. Y. 204 (1888); Keys v Leopold, 241 N. Y. 189 (1925).

While the rule seems to be rather generally accepted that analogous statutes of limitations are applied only to actions of concurrent but to those of exclusive jurisdiction, a startling divergence exists in the decisions and among the authors in the allocation of equitable actions to either the exclusive or concurrent jurisdiction.

Pomeroy in discussing the subject of concurrent jurisdiction, in §175, makes the following observation:

"In respect to no other topic connected with equity has there been such confusion of treatment, and such utter lack of any consistent principle, among text-writers, as in relation to the matter of the concurrent jurisdiction. As illustrations: Because some purely legal rights and legal causes of action may be occasioned by fraud, accident, or mistake, many text-writers have therefore placed fraud, accident and mistake, and everything pertaining to them, wholly within the concurrent jurisdiction of equity. Although the primary right arising therefrom may be entirely equitable, and although the remedy conferred may be one which can be administered only by a court of equity, such as reformation, cancellation, injunction, etc., they are all, right and remedy, treated as though belonging to this branch of equity jurisdiction. In the same manner, the subject of partnership, as an entirety, is referred to this jurisdiction, although the interest to be maintained and the remedy to be obtained are wholly equitable in their nature. These instances are examples merely of a mode of treatment which fails to draw any true line of distinction between the two great departments of the equity jurisdiction."

It seems that several different grounds of classifications have been adopted by distinguished writers of equity jurisprudence.

One mode of classification depends upon the external causes which gave rise to an action. If the cause of the action was of a character that gave rise to a secondary right, redressable either in equity or law, such causes were assigned to the concurrent jurisdiction of equity. These writers placed actions caused by fraud, mistake and accident into the concurrent jurisdiction of equity. In accepting the external cause rather than the nature of the right sought to be protected, or the nature of the remedy chosen to procure the desired relief, they did so on the theory that when fraud, accident or mistake is the cause, the action created thereby, might be in law for the recovery of money, or of real or personal property, or it might be in equity for reformation, cancellation, re-execution, etc.

If the classification of equity jurisdiction is to depend upon the causes which give rise to the substituted right it would seem unquestionable that a right created or vested in an injured party by "negligence" would come at least within that category where the jurisdiction in equity and law is concurrent.

In the case before the Bar the cause which gave to the plaintiffs their action was the negligence of the defendants, Mather, Green, Wick, Wick and Humphrey. The action was brought in equity for money damages growing out of a tort because the arbitrary and technical procedural rules of law gave no remedy to the plaintiffs.

Pomeroy in paragraph 120 states that:

"Another possible basis for a classification might be found in certain grand underlying principles, which are often called the maxims of equity, of which the following are given merely as examples: He who seeks equity must do equity; equality is equity; equity regards as done what ought to be done; equity looks at the substance and real intent, and not at the form, etc. It must be said of these principles, that they are component parts of equity, jurisprudence, and not mere external

facts or events, like fraud and mistake."

With regard to the maxims of equity it becomes apparent when an effort is made to apply them that they are not uniform but inconsistent in the results which they produce. These maxims in many instances conflict with each other. To illustrate: Equity will not follow the law if the law looks to the form and not to the substance. The plaintiffs in the within action could not sue in equity, if the maxim "equity follows the law" were followed to the letter. On the contrary, by the application of the maxim, "equity will not suffer a wrong without a remedy" the plaintiffs have been permitted to sue in equity. Moreover, by the application of the maxims, "equity looks to the substance and not to the form," and, "equity follows the law" it would appear reasonable to assume that equity would follow the statutes of limitations governing similar actions at law; and that equity inasmuch as the judgment of the plaintiffs is successful must be rendered for the corporation, would assume that in substance the action is that of the corporation, and in form, that of the stockholder. However, a further discussion of this mode of classification in view of the inability to uniformly and consistently apply the maxims definitely establishes that the results produced by it are so confusing that it cannot be accepted as a sound criterion of classifying actions brought in equity.

Another mode of classification has been made to depend not upon the external causes which created the right nor upon the nature of the remedy sought in equity, but rather entirely upon the primary rights, estates and interests created by equity.

In regard to those authors who adopted this mode of classification in attempting to point out the confusion they encountered, Pomeroy, in Paragraph 122, states:

"I take simply as an illustration the Principles of Equity, by E. H. T. Snell (London, 1874). In the 'Concurrent' jurisdiction, this author places both 'Specific Performance' and 'Injunction' although as remedies both are exclusively equitable. The reason of this arrangement seems to be that the law has jurisdiction over contracts generally, and over some of the rights and interests which may be protected by injunction. Under the 'Auxiliary' jurisdiction, he strangely enough places the remedy of 'Cancellation,' 'Bills to Establish Wills', 'Bills Quia Timet', and 'Bills of Peace'. The first of these is an exclusive equitable remedy, and is constantly used as a means of establishing or restoring equitable rights and estates. The three others are in every case final reliefs, declaring and establishing rights of property. It is difficult to conceive how a suit to 'quiet title' can be regarded as belonging to the 'Auxiliary' jurisdiction. This author, like many others, places fraud, actual or constructive, mistake, and accident as distinct heads of concurrent jurisdiction. The objections to such an arrangement are patent. In the first place, as already said, these matters are not in any sense parts of equity jurisprudence. In the second place, they are the occasions whence equitable primary rights and remedies of the most exclusive character take their rise, as well as those which are legal."

Again by other writers the classification was made to depend wholly upon the remedies which alone are given in equity.

Pomeroy in regard to this school makes the following observation in Paragraph 123:

"By far the best example of this method, I think, is the Doctrine of Equity, by John Adams, 6th Am. ed., 1783. His three chief divisons are:

1. Jurisdiction in cases in which the law courts cannot enforce a right; meaning thereby a remedial right, and intending to include in the division those remedies which are exclusively equitable. Under this head he places Specific Performance, Reformation, Cancellation and Rescission, Injunc-

tion, Bills of Peace and to Quiet Title, Suits to Foreclose or to Redeem Mortgages, Enforcement of Trusts, and others.

2. Jurisdiction in cases in which the law courts cannot administer a right,— that is, cannot fully and advantageously enforce it; the division including remedies which are within the concurrent jurisdiction of equity. Under this head he ranges Account, Partition, Settlement of Partnership Matters and Estates of Decedents, Marshalling of Assets, Contribution and Exoneration, etc.

3. Jurisdiction which is wholly auxiliary, including only Discovery, Perpetuation of Testimony and Examination of Witnesses abroad. This author is perfectly consistent in following out the principles which he has adopted; and he does not fall into the common error of taking fraud, mistake, accident, and the like as distinct heads of equity jurisprudence. The result is, that Mr. Adams' book is clear, distinct, without confusion and from his standpoint presents a very correct and consistent view of equity. But this view is certainly a partial one. The representation of equity as consisting wholly of remedies is incorrect in its fundamental conception, and when all equitable primary rights, interests, and estates are treated merely as incidents of the remedies, such a representation is actually made, even though it was undesigned on the part of the author."

It seems that Judge Story classified action brought in equity, sometimes on the basis of the external causes, and at other times on the basis of either the nature of the right, or the remedy involved.

In regard to Judge Story's classification, Pomeroy states, on page 136:

"It cannot be denied that Judge Story's Commentaries are liable to this criticism, and the result is plainly shown in his classification and arrangement and treatment of particular topics. While certain remedies are properly ranged under the exclusive jurisdiction, and others under the concurrent, as is done by Mr. Adams, this criterion is often abandoned; no clear distinction is made between remedies or the rights to them, and the equitable estates, interests, rights and obligations which are primary in their nature; and finally the mere external facts of fraud, mistake, etc., are regarded as veritable and important heads of equity jurisprudence, and are discussed at great length."

We now came to the mode of classification adopted by Pomeroy. Note must be taken that after examining the divisions created by the other distinguished authors he proceeded to classify actions in equity on a basis that would eliminate confusion and produce uniform results.

Into the exclusive jurisdiction he placed those actions in which the right, estate or interest sought to be protected or redressed was purely of equitable cognizance or in which the remedy granted was obtainable only in equity. Into the concurrent jurisdiction he placed these actions in which the right, estate or interest sought to be protected or redressed was legal and in which the remedy prayed was purely of a legal character.

Pomeroy, in §§184 to 189, inclusive, discusses the instances in which actions are triable in equity notwithstanding the fact that the ultimate relief is of a character obtainable in law. Inasmuch as the final relief in the case before the bar shall not consist of a judgment for the recovery of specific real or personal property, no discussion is necessary of cases dealing with that form of equitable relief.

But since the ultimate relief to be awarded the plaintiffs if they are successful shall consist of a money judgment, I am herewith setting forth Pomeroy's discussion of that subject.

Pomeroy states:

"Section 186. Under the third general class, where the final relief is pecuniary, or recovery or award of money in some form or for some purpose as the result of the preliminary determination or adjustment of primary or

remedial rights which are legal, the well-settled instances of the concurrent jurisdiction are many in number and varied in kind. The following are the most important and the ones most frequently met in actual practice:

"In the contract of suretyship, and the relations growing out of it between sureties themselves, sureties and their principal and the creditor, the equitable jurisdiction includes suits for exoneration and for contribution, in the decision of which the principle of subrogation and marshaling of securities, and other equitable doctrines necessary to a complete adjustment of all claims and liabilities, may be invoked and enforced. In the contract of partnership and the relations arising therefrom, the jurisdiction embraces suits for contribution, accounting, and pecuniary recovery necessary for the settlement of all claims which may exist between the partners themselves, or between the partnership and its members and the firm and individual creditors, all claims in fact for which the law by its actions gives no adequate remedy. The principle of contribution, and the pecuniary recoveries depending upon it, have, in the exercise of the concurrent jurisdiction, a very wide application, and are enforced under a great variety of circumstances. The most important, comprehensive and multiform remedy of the concurrent jurisdiction which results in pecuniary recoveries is that of accounting. The variety of its uses and possible applications is practically unlimited; it can be adapted to all circumstances and relations in which an account is necessary for the settlement of claims and liabilities, and for the doing full justice to the litigant parties. * * *"

"Section 187. In the same general class of pecuniary reliefs belonging to the concurrent jurisdiction, and united together by a tier of close analogy, are suits for the recovery of legacies, suits for the recovery or enforcement of donations causa mortis, and the various suits, involving some equitable features or incident, brought in connection with or in aid of the administration of the estates of deceased persons. * * *"

"Section 188. In another extensive class of suits brought to obtain pecuniary relief, and strictly belonging to the concurrent jurisdiction, the remedial right is occasioned by or in some manner connected with accident, mistake, or fraud. These three matters play an important part throughout the entire equity jurisprudence; and all cases involving or in any manner depending upon or growing out of accident, or mistake, or fraud, have sometimes been described as belonging to the concurrent jurisdiction, since courts of law may also take cognizance of some causes of action or defenses arising from the same source. In the classification which I have adopted, and which is far more accurate and consistent, all those cases in which the strictly equitable remedies of reformation, re-execution, cancellation, and the like, are granted on account of mistake, accident or fraud necessarily come within the exclusive jurisdiction. * * *"

"Section 189. There are some other instances in which the concurrent jurisdiction is exercised, because the legal remedy is inadequate, or because, through the imperfection of the procedure at law, a legal remedy would be wholly insufficient, if not impracticable. Among these the most important are suits to recover rent under some special circumstances; suits to procure or compel a set-off which is not admissible or possible under the practice at law; suits by one firm against another, when both firms have a common partner, and other analogous suits which the technical legal rules, as to parties, prevented from being entertained by courts of law; and under peculiar circumstances, recoveries of damages by way of compensation in addition to, or even in place of, other equitable relief."

The plaintiffs claim that since they were without right to sue in law but only in equity, it is therefore established that the action belongs strictly

to the exclusive jurisdiction of equity. Concession is made that the action was not maintainable in law and had to be brought in equity. Does that conceded fact place the plaintiffs' claim within the exclusive jurisdiction of equity?

To demonstrate the error of the plaintiffs' claim, a number of situations can be cited showing that although an action is brought in equity because it cannot be prosecuted under the rigid and inflexible rules of law, that that fact alone does not determine the exclusiveness of the jurisdiction, for example:

Story, Sec. 992. Pomeroy, Sec. 189.

Where two partnerships having common members deal with each other, neither partnership can sue the other because in the suit all of the partners must join or be joined and technically no person can maintain a suit against himself and others.

Moreover, even after the death of the common partner no action upon a contractual dealing can be maintained by the surviving partners of one partnership against the survivors of the other, because legally there never was a contract for a person as a person cannot contract with himself.

But in equity with its flexible procedural methods capable of adapting and adjusting its remedies the action can be maintained.

Both Story and Pomeroy place this type of action in the concurrent jurisdiction of equity. Note must be taken that in transactions of the aforementioned character the action cannot be maintained in law and must be brought in equity. Nevertheless the action is one of concurrent jurisdiction because the right sought to be protected and the remedy for the money judgment are legal.

Also on the subject of rents wherein situations arise where the landlord is without remedy in law though on equitable principles and good conscience he is entitled to relief, equity will provide a remedy. An apt illustration is discussed by Judge Story, Vol. 2, 926 (14 Ed). Therein it is pointed out that a landlord of an insolvent tenant, the latter receiving rents from a sub-tenant, cannot sue the sub-tenant in law for between them there is no privity of contract. But in equity the lessor is granted relief and the sub-tenant ordered to pay the rents directly to the landlord.

Actions of this type are by Story and Pomeroy (Section 189) placed in the concurrent jurisdiction of equity even though the action is solely recognized by equity.

The classification of this type of action into the concurrent jurisdiction from the standpoint of the case before the Bar, is particularly important for while the action is for the recovery of money the gravamen of the action is upon an equitable and not a legal right.

Again in Union Stockyard v Gillespie, 137 U. S. 411, the facts were that a factor had deposited with a third person the money for his principal; that the factor was personally indebted to the third person and that the latter with knowledge of the trust character of the deposit appropriated the funds to satisfy the debt that was due him.

The principal sued in equity on the theory that the trust character under which the factor held the funds followed the fund into the hands of the third person.

The Court held that the legal title was acquired by the third person at the instant the fund was appropriated to the satisfaction of the debt but that the equitable interest of the principal since the third person had knowledge of the fiduciary character under which the factor held the fund was not divested.

In discussing the question of the ability of the principal to sue in law, the Court held that he could not and that his only relief was in equity where the equitable interest could be redressed. Pomeroy and Story place this action in the concurrent jurisdiction of equity.

Another illustration of the proposition that all actions which only are maintainable in equity are not within the exclusive jurisdiction is found in litigation upon lost bonds or other lost instruments under seal. Under the

common law, no action could be maintained on a lost bond because the defendant was entitled to oyer and the plaintiff hence had to make profert.

While the technical common law rules of profert and oyer are not longer in effect in Ohio (§11333 GC), (Sergeant v Railroad, 32 Oh St 499) and an action at law can be prosecuted if the circumstances are such that the instrument can never be produced, or even though again produced, no action thereon could be maintained, there are nevertheless still situations where the payee must sue in equity. For example, if a note endorsed by the payee is lost before maturity and the payee commences suit in law he will be denied relief because there is a possibility of the note having been found, negotiated by the finder to an innocent purchaser for value, who thus becomes vested with all the rights of a true owner.

The action under such circumstances must be instituted in equity where the plaintiff, as a condition to the right of recovery, can be compelled to provide indemnity for the maker in the event the latter is subsequently required again to pay the note.

In many jurisdictions the principal under such circumstances can now sue in law for money had and received. But the extension of the jurisdiction in such cases to courts of law does not at all affect the conclusion reached by Pomeroy in classifying that type of suit.

In the briefs of the respective parties hereto in addition to the Ohio cases heretofore mentioned, reference is made to **Bryant v Sweatland, 48 Oh St 194; Neilson and Churchill v Fry, 16 Oh St 553; Gray v Kerr, 46 Oh St 652; Zuellig v Hemerslie, 60 Oh St 27; Woodward v Banning, 29 Oh Ap 81 (1928).**

In Bryant v Sweatland, supra, the plaintiffs were seeking the reformation of a written contract, claiming that at the time of its execution the parties by mistake failed to include in the document, the true agreement that was made. The question of the Statute of Limitations was raised and the Court held that the ten year statute applied.

Though no discussion is contained in the Court's opinion respecting the nature of the equity jurisdiction, it is obvious that the Court did not accept the external cause as the basis of determining the jurisdiction, for if it had the action would have come within the concurrent jurisdiction of equity. The relief of reformation for which prayer was made was obviously not of a legal character and can only be obtained in equity. Thus it is fair to assume that if any of the modes of classification hereinbefore mentioned were considered the conclusion of the Court that the ten year statute applied was predicated upon the fact that both the right and the remedy were purely of equitable cognizance.

In Neilson and Churchill v Fry, supra, the action was instituted by a surety against co-sureties for constribution. The Court held that the six year statute of limitations dealing with contracts not in writing governed. While formerly a co-obligor or co-surety who paid more than his proportionate share of the common obligation could only sue in equity, the rule has now been changed and the co-obligor or co-surety is vested with an action in law upon an implied promise for contribution.

In an action for contribution under the present rule of law the right, the wrong, and the remedy are all recognized in law, hence it is perfectly clear that the six-year statute was applicable.

In Gray v Kerr, supra, an action was brought by a partner against a co-partner, praying for an accounting. Among other things the defense of the running of the statute of limitations was interposed against the plaintiff's claim. Though it is true that the Court held that the ten year statute applied, a careful reading of the case will disclose that the principal question before the Court dealt with the time at which the plaintiff's cause of action arose. The defendant contended that immediately upon the dissolution of the partnership, except under special circumstances, the right of action became vested in the several partners. The plaintiff's position on the other hand was that though a dissolution occurred a continuing trust was imposed upon the partners to

account, and that against such trust the Statute of Limitations did not run.

The Court held that the right of action accrued immediately upon the dissolution of the partnership, and that thenceforth no trust relationship existed between the parties. Manifestly inasmuch as more than ten years had passed between the time the partnership was dissolved and the suit filed the action became outlawed under the application of either the ten year or the six-year statute. No discussion was had therein nor was it necessary respecting the applicablity of the six year provision.

The opinion discloses that in the concluding paragraph the Court made the categorical statement that the ten year statute was applicable. The opinion therein is devoid of any discussion of the authorities or the reasons accepted as the basis for the Court's conclusion that the ten year statute governed. While this case does not allocate actions for accounting into the exclusive jurisdiction of equity, a reading of **Black, Receiver v Boyd, 50 Oh St 53,** and **Johnson v Wallace, 7 Ohio 62,** clearly indicates that where no trustee or cesti que trust relationship exists and the action is brought in equity solely because of the ramified and complicated accounts, the suit definitely belongs to the concurrent jurisdiction of law and equity. In my opinion, inasmuch as the character of the court's jurisdiction was not discussed, and inasmuch as the decision turned entirely upon the question of the time when the partnership was dissolved and inasmuch, particularly, as the action was barred under the application of either the six or the ten year statute, this case cannot be construed as a precedent for the proposition that actions for accounting are within the exclusive jurisdiction of equity.

In Zueligg v Homerslie, supra, the plaintiff (surety) brought action in equity to be subrogated to the rights of the creditor against his principal. The Court in its finding held that the surety had delivered to the principal debtor the money with which the creditor (mortgagee) was paid. As a matter of law the Court held that the principal debtor acted as agent of the surety in the transmission of the money to the creditor. More than six and less than ten years had passed after the debt was paid and before the suit for subrogation filed.

The action of the plaintiff for subrogation was held by the Court not to have been outlawed by the six year period of limitations. While the acton for subrogation is placed in the concurrent jurisdiction by Pomeroy and Storey and by a majority of the decisions, there is nevertheless existent a substantial minority holding that since no implied promise exists in law obligating the creditor to deliver and transfer the securities held by him to the surety, that therefore the only means available for the surety to obtain redress is to enforce his equitable interest in and to the securities.

Under this latter theory the right sought to be enforced is purely of an equitable character, and hence the action though for the recovery of personal property may well be said to be within the exclusive jurisdiction of courts of equity. In Woodward v Banning, supra, the facts clearly indicate that the right and remedy of the plaintiff were both of an equitable nature and consequently the action undoubtedly was exclusively of an equitable nature.

An examination of the right, the wrong and the remedy upon which the plaintiffs rely in the case before the bar establishes that regardless of the mode of classification adopted the action comes within the concurrent jurisdiction of law and equity. Notwithstanding the fact that the plaintiffs pray for a discovery and an accounting, the ultimate relief, if their claim is successful, will be a money judgment. The wrong about which they complain and which the Court herein has determined to have been committed, is an act of negligence. The right which is sought to be protected is a legal property right of the corporation.

Hereinbefore, I have held that in a stockholders' derivative action the plaintiff need not have been, at the

time the wrong was committed, the owner of stock in the corporation. The above mentioned ruling was made because I was of the opinion that the rights asserted by the stockholders were primarily and in substance that of the corporation. The application of that rule means that a stockholder can sue even though he owned no stock when the wrong was committed. If he can thus institute an action for the corporation then it follows that at the time the tort or wrong is perpetrated no legal nor equitable right of the stockholder need be violated.

If I were now to hold that this Court has exclusive equitable jurisdiction of this action, because the equitable right of the plaintiff stockholder, was violated on June 15, 1930, when the wrong was committed, then I would have to go further and say that on said dates as a prerequisite to the right of the plaintiffs to sue they had to be a stockholder of Republic Iron, Obviously a ruling to the effect that an equitable right of the plaintiff is sought to be protected in a suit of this character, cannot be reconciled to the holding that a plaintiff in a stockholders' derivative action does not have to own stock in the corporation at the time the wrong is committed.

While the rights, the external cause, and the remedy involved in the case before the Bar are of a legal character the plaintiff was permitted to sue in equity because a Court of law owing to its inflexible and rigid procedural rules were incapable of adapting its procedure to give relief.

The plaintiffs rely primarily upon Glass v Courtwright, supra, but an examination of that case will disclose that Judge Kinkead based his ruling on the New York decisions in determining that a stockholders suit, brought for and in behalf of the stockholders and other similarly situated and in which the judgment if rendered was to be in favor of the stockholders directly and not the corporation, came within the exclusive jurisdiction of equity. Judge Kinkead reviewed the New York decisions and rendered his decision, essentially on the discussions found in Mason v

Henry, 152 N. Y. 529, and Brinkerhoff v Bostwick, 99 N. Y. 185. He discussed the Ohio cases most of which are reviewed herein, and quoted from Mason and Henry, and Brinkerhoff v Bostwick, supra, in the reasoning of which he bottomed his conclusion.

These latter cases, however, if they ever were authority for the claim that a stockholders derivative action based upon the claim that directors were negligent and brought while the corporation is in existence, come within the exclusive jurisdiction of equity. were definitely overruled in Potter v Walker, 276 N. Y. 15 (1937).

In this latter case a stockholder sued in equity alleging (a) that the directors had made secret profits and (b) that some of the directors had caused damages to the corporation through negligent treatment of the corporate business.

The Court held that the action praying for damages caused by negligence was governed by the New York statute controlling injuries to property and which except for the period of time is similar to §11224 GC.

On the other hand, it held that the ten year statute, analogous to §11227 of our Code, governed that phase of the action where an accounting for secret profits was prayed for.

In this case of Potter v Walker, supra, the Court said, on page 337:

"In respect to those causes of action by which it is sought to recover profits received by directors by reason of wrongful acts, an action at law would not afford adequate relief. To the extent that an accounting is necessary, the right and the remedy must necessarily be of an equitable nature. The appellate division is therefore clearly right in applying the ten year statute of limitations as to such causes of action. Civil Practice Act, Section 63; Hanover Fire Ins. Co. v Morse Dry Dock & Repair Co., 270 N. Y. 86, 200 N. E. 589."

"Those causes of action, however, which are based merely upon negligence of two of the directors who are not al-

leged to have participated in the receipt of any wrongful profits at the expense of the corporation, require the application of a different rule. The formal demand for relief in the complaint does not determine the legal or equitable character of the action. These causes of action are essentially and exclusively to recover for an injury to the property of the corporation within the meaning of subdivision 3 of section 48 of the Civil Practice Act, as it read prior to its amendment by chapter 558 of the Laws of 1936. If the remedy were invoked directly by the corporation or a receiver, a common law action for damages would lie. It would be adequate and, consequently, equitable relief would be unnecessary. O'Brien v Fitzgerald, 143 N. Y. 377, 380; 38 N. E. 371; Dykman v Kenney, 154 N. Y. 483, 491, 492; 48 L. E. 894; Curtis v Connly, 257 U. S. 260, 43 Sup. Ct. 100, 66 L. Ed. 222. Some dicta occur in the earlier reports of this Court's decisions indicating doubt in the minds of the authors of the opinions whether the same rule by which a corporation or its receiver is governed in actions against directors for negligence would apply to a stockholder (O'Brien v Fitzgerald, supra, 143 N. Y. 377, at pages 381, 382; 38 N. E. 371; Mason v Henry, 152 N. Y., 529, 535, 46 N. E. 837), but no direct adjudication to that effect."

Furthermore in Wallace v . Lincoln Savings Bank, 89 Tenn., 630, a stockholders action against directors, cited and followed by the United States Supreme Court in Curtis v Conley, 257 U. S. 260 (1921) and repeatedly by appellate courts in different states, Judge Lurton said:

"The chancellor seems to have entertained the opinon that, because a stockholder can alone sue in equity upon such a cause of action, therefore this was ·one of that class of purely equitable actions against which the statute does not operate. But, as we have before seen, this kind of suit is at last but the suit of the corporation for its benefit, and upon its right of action. If, for any reason the corpora-

tion is estopped from suing, or its action is barred, the suit by the stockholders or creditor is likewise affected. 'A suit of this character,' says Mr. Morawetz, 'is brought to enforce the corporate or collective rights, and not the individual rights of the stockholders. It may therefore properly be regarded as a suit brought on behalf of the corporation, and the shareholders can enforce only such claims as the corporation itself could enforce. Moreover, the essential character of a cause of action belonging to a corporation remains the same, whether the suit to enforce it be brought by the corporation or by a shareholder. Thus a legal right of action would not be treated as an equitable one, or become governed by the rules applicable to equitable causes of action, or to limitations, etc., because a shareholder has brought suit in equity to enforce it on behalf of the company' * * * '' (15 S. W. pp. 452, 453.)

3 Fletcher Cyc. Corporations (Perm. Ed.) 800, Sec. 1304:

"The limitations applicable to an action by the corporation at law is equally applicable to the suit of the stockholder upon the corporation right of action in equity. If the right of the corporation to sue is barred by limitations, a stockholder cannot sue as representing the corporation."

That stockholders derivative actions against directors are barred by statutes of limitations governing analogous actions at law is also the holding in the following cases:

Pollitz v Wabash Railroad Co., 207 N. Y. 113; 100 N. E. 721 (1912); Wallace v Lincoln Savings Bank, supra; Winston v Gordon, 115 Va., 899; 80 S. E. 756 (1914); Curtis v Connly, 257 U. S. 260 (1921); Boyd v Mutual Fire Ass'n. of Eau Claire, 116 Wisc. 155; 94 N. W. 171 (1903); Pietsch v Milbrath, 123 Wisc. 647; 101 N. W. 388 (1904); Magale v Fomby, 132 Arl. 289, 201 S. W. 278 (1918); Blythe v Enslen, 203 Ala. 692, 85 So. 1 (1919), on re-argument, 95 So. 479. Becker v Billings, 304 Ill. 190, 136 N. E. 581 (1922); Kelly v Dolan, 233 Fed. 635 (C. C. A. 3, 1916); Cullen v Coal Creek Mining Co.,

42 S. W. 693 (Tenn. 1897); Ashhurst's Appeal, 78 Pa. St 370, 395; In re Franklin Brewing Co. (C. C. A. 2, 1920), 263 Fed. 512; Link v McLeod, 194 Pa. 566; 45 Atl. 340 (1900).

It is my finding of law that the action of the plaintiffs in respect to their claim that on January 15, 1930, the defendant directors, William ▉▉▉▉▉ G. Mather, E. B. Greene, George Humphrey, Myron Wick, and Philip Wick, were negligent when they purchased the 50,000 shares of Inland is barred by §11224 GC.

In accordance with the foregoing, the finding of the Court is for the defendants and a decree shall be so entered.